U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

UNITED STATES DISTRICT COURT          FEB 27 2006

NORTHERN DISTRICT OF NEW YORK                    Case:   **04-cv-1193**
-------------------------------------------~~LAWRENCE K. BAERMAN,~~ **CLERK**
                                         ALBANY                  (LEK/RFT)
**LOEBER et.al.**
                                         Plaintiffs}

**v.**

**SPARGO et.al..**
                                         Defendants.
----------------------------------------------------------------------------x

### H. WILLIAM VAN ALLEN AFFIDAVIT PRO SE IN SUPPORT OF PLAINTIFFS' NOTICE OF CROSS MOTION FOR CHANGE OF VENUE TO JURISDICTION OF WDNY 06-CV-00080 CASE FORJONE et.al. V. CALIFORNIA et.al. in RESPONSE IN OPPOSITION TO THE MOTION TO DISMISS THE AMENDED COMPLAINT BY THE U.S. DEPARTMENT OF JUSTICE and DEFENDANTS MAYOR MICHAEL BLOOMBERG AND THE CITY OF NEW YORK ABSENT ESSENTIAL MUNICIPAL PARTIES

**STATE OF NEW YORK )**
                              **} ss.**
**COUNTY OF ULSTER   )**

 **I, H. William Van Allen**, being duly sworn, deposes and says under penalty for perjury:

 1. I am a Plaintiff pro se without being an attorney in the above referenced case, and

affirm this affidavit in support of PLAINTIFFS' NOTICE OF CROSS MOTION FOR

CHANGE OF VENUE TO JURISDICTION OF WDNY 06-CV-00080 CASE *FORJONE et.al.*

*V. CALIFORNIA et.al.* pursuant to Local Rule 7.1, Fed. R. Civ. P. 19(a), in response to the

Motion to Dismiss by separate notice of the U.S. Department of Justice filed February 10, 2006

shown as Docket #64 (a copy of the notice herewith marked **EXHIBIT A**) and Defendant the

city of New York filed February 17, 2005 shown as Docket #65 (a copy of the Notice herewith

marked **EXHIBIT B**) the First MOTION to Dismiss Motion Hearing set for 4/7/2006 09:30 AM

in Albany before Judge Lawrence E. Kahn with Response to Motion due by 3/21/2006 Reply to

Response to Motion due by 3/27/2006, and both motions are without essential parties to this case

herein, with Plaintiffs response due February 28, 2006 and return date of March 17, 2006 and DOJ reply date March 6th 2006

2.      That I am not a party in the referenced case **WDNY 06-CV-00080 *FORJONE et.al. V. CALIFORNIA et.al.*,** however believe I am an essential party therein entitled to intervene as of right.

3.      That I am a pro se Plaintiff member of ***The AD HOC New York State Citizens for Constitutional Legislative Redistricting*** statewide redistricting case *Loeber et.al. v. Spargo et.al.*

4.      That two pro se plaintiffs John Joseph Forjone and Christopher Earl Strunk in case WDNY 06-CV-00080 *FORJONE et.al. v. CALIFORNIA et.al*, are the co-chairmen members of ***The AD HOC New York State Citizens for Constitutional Legislative Redistricting*** statewide redistricting case *Loeber et.al. v. Spargo et.al.* and herewith annexed provide declarations in support of this notice of cross motion for change of venue to WDNY.

5.      That in the context of this supporting affidavit I have given due notice to all pro se Plaintiffs who are members of *The AD HOC New York State Citizens for Constitutional Legislative Redistricting* of my intent to cross motion for change of venue and as such believe all are in unanimous agreement and give consent accordingly.

6.      That I am the Plaintiff who provided the supporting affidavit for the Order to Show Cause duly served on December 1, 2005, and in which the Court has wrongly marked the hearing for a 28 USC 2284 panel off the calendar, a copy of the signed ordered herewith marked **EXHIBIT C**.

7.      That in the matter of denial of summonses for the municipalities referenced in the amended complaint caption, with a motion for reconsideration of procedural matter with clarification *en banc* per the dismissal of the Writ of Mandamus at 2nd Circuit case 05-6536-op, wherein Mr. Strunk and I challenge the wrongful denial of due process by the clerk of the court

and Judge Lawrence E. Kahn in the matter of the outrageous mishandling of my application for "Notice of Appeal" as a nullity without fee tendered, and as such has been cynically used by both Judge Lawrence E. Kahn and the Clerks office to sidestep the OSC hearing scheduled for December 16, 2005 for a 28 USC 2284 panel, and with time being of the essence the January 1, 2006 HAVA deadline injuring Plaintiffs and those municipalities yet to be summoned to appear.

8.      That starting no later than December 1, 2005 and no later than December 11, 2005 having been denied issuance of the necessary summons for the municipalities who are essential parties in interest I faxed a notice to all municipalities of the pending deadline, a copy of the Fax log herewith marked **EXHIBIT D**, including notice to Otsego County.

9.      That I received phone calls from the corporation counsel of Jefferson County and Columbia County refusing a y service other than that required by the NYS CPLR also requiring that a summons be issued to accompany the complaint for such service.

10.     That on or December 23, 2005 James Konstanty Corporation Counsel for Otsego County and the Board of Elections within filed a notice appearance and demand for service of a summons and complaint entered by the clerk into docket as item# 57 December 30, 2005, a copy of the Notice and Demand herewith marked **EXHIBIT E**.

11.     That subsequent to the failure to stay the HAVA January 1, 2006 deadline as impacts the various municipalities state sub-divisions and plaintiffs with real property affected by loss of Federal Funds and or penalties have been threatened by the U.S. Department of Justice on January 10, 2006, a copy of the DOJ Letter herewith marked **EXHIBIT F**.

12.     That I have personally been a witness to nearly all public meetings of the New York State Board of Election for many years and in the context of the span of time since the

April 22, 2002 reapportionment have attended nearly all convened in Albany including every meeting since October 2004.

13.     That the DOJ, State Board of Elections since the threat of penalties shown by **EXHIBIT F** have initiated a preliminary negotiation of compliance for HAVA by a Bottom-up municipality by municipality agreement however were not mentioned by the State Board proposed minutes of either January 10, or January 31, both herewith marked **EXHIBIT G.**

14.     According to the Declarations of Forjone and Strunk herewith annexed,  on February 6, 2006 subsequent to the injury caused by the failure to stay the January 1, 2006 HAVA Deadline, denial of substantive due process in NDNY and outrageous delay at the Second Circuit in the petition for Writ of Mandamus, threatening posture of the DOJ shown by **EXHIBIT F**, and failure of the NYS BOE to mention the threat posed to the municipalities and people's Bottom–up suffrage and Homerule autonomy in any of the meetings minutes shown as **EXHIBIT G** ,  Mr. Forjone and Mr. Strunk and others realizing the urgent need for the municipalities to be provided with due process in order to initiate local government right of the people resident therein under the New York State Constitution Article III to  initiate compliance with districting and Homerule autonomy under Federal jurisdiction before the March 1, 2006 compliance deadline, therefore filed  the complaint _Forjone et.al. v. California et.al._ in Western District of New York case 06-cv-0080 with service of the summonses and complaint upon defendants by February 21, 2006 accordingly, a copy of the complaint marked as **EXHIBIT 3** as part of a submission annexed by Mr. Strunk in his Declaration.

15.     That on February 9, 2006, State Commissioner Douglas Kellner briefed various citizen coalitions on the status of HAVA compliance in regards to the implementation of the statewide database and the selection of new voting systems, the "**Notes from HAVA Coalition**

Meeting" as a public meeting outlined the "Bottom-up" basis for compliance, a copy herewith marked **EXHIBIT I**.

16.     In the "Bottom-up" basis for compliance by municipalities shown as **EXHIBIT I**, requires the municipalities to participate in the Federal due process because the People resident within each such municipality are directly impacted by the levy under EL §4-138 will have upon real property being effected differently on a municipal by municipal basis, quote:

> **"Statewide Database**
>
> "**New York State will institute the 'bottom up' approach in creating a statewide database that will be modeled after Washington State** (a system developed in consultation with Microsoft). **Counties will retain control over their local list and determine eligibility accordingly**. Local jurisdictions will also be responsible for upload into the statewide system (which will be either in real time or within half an hour). The technical issue that remains is the compatibility of the roughly eight different registration systems in use throughout the state since each interface needs to be tailored. The State Board of Elections is considering incurring the cost for statewide compatibility of the database.
>
> The database is not expected to be in use by the November elections, although counties are encouraged to upload local voter databases to the statewide system. The statewide voter registration database is expected to be in place by the spring of 2007.
>
> "A minor legal issue that is worth noting is **the inconsistent determination of who is registered to vote**. No county in New York State has a fixed and completely accurate list due to the provisional ballot rules that allows for challenges on Election Day.
>
> "Another issue that was mentioned relating to the statewide databases was the verification and identification requirements. Although Kellner recognized that these are still active issues, he also emphasized the minimal impact of the statewide database system because the identifications are largely done by inspectors on Election Day. Additionally, Affidavit ballots that were cast due to limitations by the identification requirements were not a significant proportion of the total A ballots cast.

17.     That the City of New York has had a more than $27 million of funds available for machine improvement and maintenance since no later than 1991 as the Associated Press report dated November 8 2004 indicates, a copy of the Article is herewith marked **EXHIBIT J.**

18.     That the city of New York with full knowledge and acquiescence of the US DOJ voting rights section in a "bi-partisan" effort has maliciously prevented the voided expenditure of available funds to maintain existing machines in an effort to sabotage the electoral process that had been ongoing before 1991 and despite the allotment of municipal funds conspired to obtain Federal Funds instead, as first initiated under the 1993 National Voter Registration Act with intent to create the basis for what in October 2002 became the Help America to Vote Act.

19.     That subsequent to the contrived so-called half-measure recount during the 2000 national election devised in Florida in which Defendant Spargo was a material participant devised to create the conditions for HAVA enactment, referenced in the Complaint.

20.     That based upon information and belief before 2000 and following the HAVA enactment in coordination with bi-partisan intent to implement HAVA the Brennan Center represented the Working Families Party, ACORN, and individual voters in the Federal case sought to compel the New York City Board of Elections to repair the sensor latches on the City's voting machines and were successful at trial.

21.     The lawsuit, filed in July 2003, claimed that as many as 60,000 New Yorkers have lost their votes in the 2000 general election through accidental undervoting that the sensors latches are designed to prevent. The Board of Elections had voted to repair the latches, but later reversed its decision. In October 2003, the Board of Elections settled the lawsuit, agreeing to repair the voting machines in time for the March 2004 elections. Therein the litigation provided evidence that Press Release: Lawsuit Charges City Board of Elections Knowingly Failed to Repair Voting Machines, *http://www.brennancenter.org/programs/dem_vr_lit_sensor_latch.html,* a copy of the Press Release herewith marked **EXHIBIT K**.

**22.**    That subsequent to what appears as a contrived half-measure to recount votes only in certain Florida counties during the 2000 national election in which Defendant Spargo was a material participant, such a serious error appears devised to create the propaganda and chaos for HAVA enactment in October 2002 as continuous unfolding process that had started in 1993 with the NVRA to centralize a national data base and impose electronic voting machines in every state using the questionable fig leaf of the Americans with Disabilities Act, that in New York especially since Congressman John F. Kenney in the fifties divided upon the Social Security Fund separating Mental Health from Mental Disability physical conditions, New York State has been at the forefront in matters of promoting the ADA, and in Election Law has for decades provided special assistance provisions for the disabled effective suffrage; therefore the entire HAVA ADA provisions appears as a *strawman* issue to push questionable equipment upon municipalities and hapless tax payers resident therein without actual Homerule, by dark political forces that appear as an industry that overlaps the gambling machine manufacturing industry anxious for a piece of the annual election cash flow available nationally as a result of HAVA.

23.    That on February 24, 2006 a New York Times Articles entitled "*City's Lawyer Criticizes State on Rules for Voting Machines*", a copy herewith marked as **EXHIBIT L**, emphasis the shift of that the DOJ / NYS BOE efforts to focus HAVA compliance upon Bottom-up efforts, indicates the state's plan to modernize its voting system came under attack again on when New York City's chief lawyer called the proposal for regulations on voting machines "*gravely defective*" and urged the State Board of Elections to overhaul the plan- thereby emphasizes the needs for every municipality to have Federal venue for dealing with both the State and the DOJ in this matter.

*24.*     That as a result of my notification by facsimile  of the requirements of EL §4-100

as to Election District size avail for local government cost cutting measures, on Tuesday,

February 21, 2006 a Poughkeepsie Journal Article entitled "*Plan would reduce local election*

*costs -Democratic chief cites city, town savings*" reported by Michael Valky, indicates that the

number of election districts, inspectors and voting machines in the town and city of

Poughkeepsie would decrease under what is being labeled a cost-saving plan by Dutchess

County Democratic Elections Commissioner Fran Knapp, which further indicates "IF" NOT

done per the letter of EL §4-100 / EL §5-213 requirements, cries for Federal due process to give

municipalities necessary due process to comply with HAVA, e.g. compliance with state laws in

the process of complying with Federal Law,  an Article copy herewith marked **EXHIBIT M**.

25.     That on February 23, 2006 I reviewed **Exhibit 8** of the Strunk Motion to

Intervene as of Right in the Eastern District of New York case *Torres et.al. v. NYS BOE et.al.*

04-cv-1129 with an application per FRCvP 5 to intervene as a Plaintiff in the above referenced

case with the *Memorandum and Order including Preliminary Injunction*  ("Order") so ordered

by the Honorable Judge John Gleeson on January 27, 2006 in the matter of the constitutionality

of the New York State Election Law § 6-106 and §6-124 for state party nominations of the office

of State Supreme Court Justice under provisions of the State Constitution Article 6 Section 6(c),

herewith marked **EXHIBIT H**, in the matter of then State Justice Kahn's October 17, 1990 so

ordered dismissal of the complaint in the case *Castracan V Colavita i*n Albany County Supreme

Court with index 6056-90, and

26.     As such the questionable dismissal order of October 17, 1990 is a matter now in

conflict with both the Seventh Cause of Action in Loeber v Spargo Amended Complaint as a

basis for recusal from any further hearing especially when viewed in the light of the arbitrary treatment with which we have had to endure since November 21, 2005.

27.     That the *Castracan v Colavita* case was no run-of-the-mill matter. Rather, it t was an extraordinary and historic constitutional challenge to the political manipulations of the judicial nomination in New York by the practice of major party cross-endorsements and illegally- conducted judicial nominating conventions, and as a review 15 years later of the files demonstrates, what then state Justice Kahn did in light of the January 27, 2006 Federal Court Decision by the Honorable John Gleeson in *Torres v NYS BOE*.

28.     In light of Mr. Strunk's motion to intervene in EDNY 04-cv-1129 *Torres v. NYS BOE* and Mr. Forjone's State Judicial Districting equity challenge in WDNY 05-cv-395 *Forjone v. Leavitt*, the Castracan case bias and extraordinary partisan perception of impropriety that certainly goes to operation of 28 USC 455 now here in *Loeber v. Spargo*, again done repeatedly from October 25, 2004 through until this day shows judicial action was to pervert elementary legal standards and falsify the factual record so as to "dump" the case as 15 years ago with reference to the October 17, 1990 decision shown here as **EXHIBIT H** along with the records listed in the October 31, 1995 letter to Patricia Hynes of the ABA Standing Committee on Federal Judiciary, a copy of the letter herewith marked **EXHIBIT N**.

29.     That on as a result of reviewing the collected report of *the New York State Commission on Government Integrity*, it held in "*Becoming a Judge*" on page 293 that quote:

".political parties are geared to reward loyalty, not merit: to discourage, not encourage, independence and diversity; and to obtain power rather than promote justice. Such - goals, however valuable to the operation of the party system in general, have no place in the election of our judges."

here in the Second Circuit, it appears as a lack of uniformity and that there is no difference between the condition of the Federal or State Judiciary in the matter of expectation of impartiality ESPECIALLY in the Northern District of New York or 3rd Department.

30.     That as early as September of 2004 the State Comptroller had been issuing alarming reports in the matter of the imminent collapse of local governments and the extreme burden unequal taxation has upon real property tax payers, now in 2006 goes to the matter complained of here in *Loeber v. Spargo*, in *Forjone v. Leavitt* and in *Forjone v. California* referenced by both Mr. Strunk and Mr. Forjone in there Declarations, and of course "sidestepped" even by Judge Gleeson in *Torres v. NYS BOE* as had been done by Chief Judge Korman in *Molinari v. Powers*,- no venue of Second Circuit is free from the status quo effects on justice,  a copy of the  Hevesi Comptroller Report dated September 29, 2004 already previously in  exhibit is herewith marked **EXHIBIT "O"**.

**WHEREFORE**, Movant prays of the Court for relief herein per FRCvP Rule 19(a) requesting as of right that the entire *jus tertii* class of *The AD HOC New York State Citizens for Constitutional Legislative Redistricting* statewide redistricting case *Loeber et.al. v. Spargo et.al.* NDNY 04-cv-1193, be granted a change of Venue to the Western District of New York under the discretion of the Honorable Chief Judge Richard J. Arcara WDNY for further adjudication by that Court for plain speedy with efficient remedy for actual justice under FRCvP accordingly, and that Defendants Motion be deemed pre-mature without the necessary parties joined, and for differently and further relief that this court deems necessary including but not limited to severance of necessary parties and or issues to WDNY and or EDNY, and minimally Your Honor's recusal per 28 USC 455.

**H. WILLIAM VAN ALLEN**

Sworn to before me this
27 day of February 2006

_____
**NOTARY PUBLIC**

KARIN HORNER
Notary Public, State Of New York
No. 4931605
Qualified In Ulster County
Commission Expires May 31, 20 06

Van Allen Affidavit in Support of Venue Change Page 10

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RONALD G. LOEBER, et al.,                    )
                                             )
                Plaintiffs,                  )
                                             )
        v.                                   )  Civil Action No. 1:04cv1193 (LEK/RFT)
                                             )
THOMAS J. SPARGO, et al.,                    )
                                             )
                Defendants.                  )
_____     )

## FEDERAL DEFENDANTS' MOTION TO DISMISS

Come now defendants Alberto Gonzales, Attorney General of the United States, the United States Election Assistance Commission (EAC), and Thomas R. Wilkey, as Executive Director of the EAC (collectively, the "federal defendants"), and move this Court for entry of an Order, dismissing the Amended Complaint filed by plaintiffs in this action in so far as it seeks to bring claims against the federal defendants and insofar as it seeks to challenge the constitutionality of the Help America Vote Act, Pub. L. No. 107-252, 116 Stat. 1666, 42 U.S.C. 15301-15545 (2002) ("HAVA"). This motion is made pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted and pursuant to Fed. R. Civ. P. 12(b)(1), for lack of jurisdiction over the subject matter based on plaintiffs' lack of standing.

Accordingly, the federal defendants pray that this Court grant this motion to dismiss. Pursuant to the local rules, a notice of motion, memorandum of law, affidavit of counsel, attachment of an unpublished case, and certificate of service are attached.

Date: February 10, 2006

Respectfully submitted,

GLENN T. SUDDABY
United States Attorney

WAN J. KIM
Assistant Attorney General
Civil Rights Division

JOHN K. TANNER
Chief, Voting Section

/s/

/s/

BARBARA D. COTTRELL
Assistant United States Attorney
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, NY 12207-2924
(518) 431-0247 (telephone)
(518) 431-0429 (facsimile)
Bar Roll No. 101411

T. CHRISTIAN HERREN JR
chris.herren@usdoj.gov
ROBERT POPPER
robert.popper@usdoj.gov
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
Room 7254--NWB
950 Pennsylvania Avenue, NW
Washington, DC  20530
(800) 253-3931 (telephone)
(202) 307-3961 (facsimile)

# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

In the 42 USC 1983 suffrage and autonomy discrimination
Matter of:  Ronald G. Loeber, Burr V. Deitz, William E.
Bombard, William A. Gage, John Joseph Forjone, H. William
Van Allen, Fairlene G. Rabenda, Roy-Pierre Detiege-Cormier,
Ronald E. Sacoff, Gabriel Razzano, Edward M. Person, Jr.,
Christopher Earl Strunk and The AD HOC New York State
Citizens for Constitutional Legislative Redistricting

Petitioners / Plaintiffs:

-against-

THOMAS J. SPARGO, individually and as Justice of the NYS
Supreme Court and all Justices of the State Supreme Court,
JOSEPH L. BRUNO, 61 JOHN and JANE DOE NYS
SENATORS all individually and as state Senators past and
present; SHELDON SILVER, 149 JOHN and JANE DOE NYS
ASSEMBLY MEMBERS all individually and as past and
present; GEORGE E. PATAKI individually and as NYS
Governor; RANDY A. DANIELS, NYS Secretary of State with
authority per CRL and Repository for corporations and
unincorporated associations service; per CPLR 1012 New York
State Attorney General ELIOT SPITZER; THE NEW YORK
STATE BOARD OF ELECTIONS, and every Municipal Board
of Elections, along with every Corporation Counsel of every
Municipality with a Board of Elections, THE CITY OF NEW
YORK ("NYC"), Michael Bloomberg NYC's Mayor, UNITED
STATES ELECTION ASSISTANCE CORPORATION
("EAC"), THOMAS R. WILKEY EAC Executive Director,
THE NATIONAL ASSOCIATION OF SECRETARIES
OF STATE ("NASS") by LESLIE REYNOLDS Executive Director
for the Executive Committee and PETER KOSINSKI,
individually and his official capacity at the NASS; and per 28
USC 2403 The United States Attorney General ALBERTO
GONZALEZ ("USDOJ").

Respondents / Defendants.

------------------------------------------------------------------------x

**NEW YORK CITY
DEFENDANTS'
NOTICE OF MOTION**

Civil Action No.1:04 Civ.
1193 (LEK/RFT)

 

      **PLEASE TAKE NOTICE** that, upon defendants' New York City and Michael
Bloomberg ("City defendants") memorandum of law in support of their motion to dismiss, dated
February 17, 2006, and all other pleadings and proceedings herein, the City defendants will
move this Court on April 7, 2006, at the United States Courthouse, for the Northern District

Court of New York, located at the James T. Foley Courthouse, 445 Broadway, Albany, New

York, at 9:30 A.M. or as soon thereafter as counsel may be heard for an order pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure dismissing the complaint on the ground that it

fails to state a claim upon which relief may be granted, and granting such other relief as to this

Court seems proper.

    **PLEASE TAKE FURTHER NOTICE**, that answering papers, if any, must be

served on the undersigned at least seventeen (17) days before the return date of this motion,

pursuant to Local Rule 7.1(b)(1).

Dated:    Kingston, New York
     February 17, 2006


         MICHAEL A. CARDOZO
         Corporation Counsel of the City of New York
         Attorney for City Defendants City of New York and
         Michael Bloomberg


            /s/
         By: _____
         Anthony Giardina (Bar Number: 513630)
         Assistant Corporation Counsel
         P.O. Box 1277
         Kingston, N.Y.  12402
         Telephone: (845) 340-7559
         Fax: (845) 340-7564
         E-mail: agiardin@law.nyc.gov

04 Civ. 1193 (LEK)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

In the 42 USC 1983 suffrage and autonomy discrimination
Matter of:  Ronald G. Loeber, Burr V. Deitz, William E.
Bombard, William A. Gage, John Joseph Forjone, H. William
Van Allen, Fairlene G. Rabenda, Roy-Pierre Detiege-Cormier,
Ronald E. Sacoff, Gabriel Razzano, Edward M. Person, Jr.,
Christopher Earl Strunk and The AD HOC New York State
Citizens for Constitutional Legislative Redistricting

Petitioners / Plaintiffs:

-against-

THOMAS J. SPARGO, individually and as Justice of the
NYS Supreme Court and all Justices of the State Supreme
Court, et al.

Respondents / Defendants

---

**NEW YORK CITY DEFENDANTS'
NOTICE OF MOTION**

---

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for City Defendants*
*Box 1277*
*918 Ulster Avenue*
*Kingston, N.Y.  12402*

*Of Counsel:  Anthony Giardina*
*Tel: (845) 340-7559*
*NYCLIS No.*

---

*Due and timely service is hereby admitted.*

*New York, N.Y. ...................................................................................., 200 ..*

*.................................................................................................. Esq.*

*Attorney for ..........................................................................................*

# EXHIBIT C

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF NEW YORK**    Case: **04-cv-1193**

-----------------------------------------------------------------------x

**In the 42 USC 1983 suffrage and autonomy discrimination**    . (LEK / RFT)
**Matter of:** Ronald G. Loeber, Burr V. Deitz, William E. Bombard,
William A. Gage, John Joseph Forjone, H. William Van Allen,
Fairlene G. Rabenda, Roy-Pierre Detiege-Cormier, Ronald E. Sacoff,
Gabriel Razzano, Edward M. Person, Jr., Christopher Earl Strunk and

**The AD HOC New York State Citizens for Constitutional**    **TEMPORARY**
**Legislative Redistricting**

**Petitioners / Plaintiffs:**    **STAY ORDER**

-against-    **TO SHOW**

**THOMAS J. SPARGO**, individually and as Justice of the NYS Supreme    **CAUSE**
Court and all Justices of the State Supreme Court, **JOSEPH L. BRUNO**,
61 JOHN and JANE DOE NYS SENATORS all individually and as state
Senators past and present; **SHELDON SILVER**, 149 JOHN and JANE DOE
NYS ASSEMBLY MEMBERS all individually and as past and present;
**GEORGE E. PATAKI** individually and as NYS Governor;
**RANDY A. DANIELS**, NYS Secretary of State with authority per CRL and
Repository for corporations and unincorporated associations service;
per CPLR 1012 New York State Attorney General **ELIOT SPITZER**;
**THE NEW YORK STATE BOARD OF ELECTIONS**, and every
Municipal Board of Elections, along with every Corporation Counsel of every
Municipality with a Board of Elections, **THE CITY OF NEW YORK ("NYC")**,
Michael Bloomberg NYC's Mayor, **UNITED STATES ELECTION ASSISTANCE**
**CORPORATION ("EAC")**, **THOMAS R. WILKEY EAC Executive Director,**
**THE NATIONAL ASSOCIATION OF SECRETARIES OF STATE**
("NASS") by **LESLIE REYNOLDS** Executive Director for the
Executive Committee and **PETER KOSINSKI**, individually and
his official capacity at the NASS; and per 28 USC 2403
The United States Attorney General **ALBERTO GONZALEZ ("USDOJ")**.

**Respondents / Defendants.**

-----------------------------------------------------------------------x

Upon the affidavit of **H. WILLIAM VAN ALLEN** affirmed on November 23, 2005,

along with the Law Memorandum, amended complaint and exhibits annexed hereto, for

equity relief: (a.) convene 28 USC 2284 panel to reapportion of Fifty (50) State Senate

Districts ("SDs") statewide, effecting One Hundred Fifty (150) Assembly and twenty-nine

(29) U.S. House Districts by March 1, 2006;

U.S. DISTRICT COURT
N.D. OF N.Y.
**RECEIVED**

NOV 2 9 2005

LAWRENCE K. BAERMAN, CLERK
ALBANY

1

(b.) Nationwide temporary stay of HAVA filings pending hearing for a preliminary
injunction in the alleged irreparable harm posed by the 2002 *Help America to
Vote Act* ("HAVA") *state-plan compliance* submissions January 1, 2006 time
deadline by the state of New York State and the several states and or territories
for the U.S. DOJ and the U.S. EAC reimbursement of each state of the several
states for modernizing state provision of suffrage by November 2006 elections;

(c.) allege irreparable harm as well as injury associated with the funding mechanism
devised by Congress in HAVA Section 101 that by use of "*Voting Age
Population*" ("VAP") rather than *Citizen Voting Age Population* without the
civilly dead ("CVAP") is unconstitutional, and the funding calculation formula
therefore denies interstate equal distribution of HAVA funds among the states,
and poses a significant intrastate harm here in the state of New York as an
unequal burden upon U.S. Citizens resident in a municipality entitled a board of
elections to provide People Bottom-up suffrage Home-rule autonomy- doesn't;

(d.) allege inter alia a 1965 *Voting Rights Act* matter effecting equal protection in the
2006 state electoral cycle pending USDOJ and EAC certification of HAVA funds
for a portion of the purchase of voting machines, when combined with substantive
due process matter in mis administration and application of the state of New York
Constitution accruing since the U.S. Supreme Court Decisions in the redistricting
case *WMCA v. Lomenzo*, 377 U.S. 633 (1964) related to "total population" use in
equal districts as if in Reynolds v. Sims, 377 US. 583 (1964) "one man one vote"
applied to those ineligible to vote, requires a strict review test under a totality of

2

effect and circumstances in an equity hearing for permanent injunction for CVAP
proportional reimbursement nationally rather than VAP;

(e.) And for such other and different relief deemed necessary.

That in the matter of convening a 28 USC 2284 three judge panel relief involving
statewide senate districts as a result of the April 22, 2002 reapportionment;

Movants have shown a preponderance of prima facie evidence with infringement of
suffrage attributable to Defendants that appear to act under color of the *WMCA* court decision
therein declaring the NYSC Article III Section 4 Senate District 1894 "enlargement formula"
to increase from the minimum required fifty (50) Senate Districts unconstitutional, and
remains unconstitutional, notwithstanding use of total population rather than just citizens; that
without a state constitution express replacement formula, Defendants appear to act by mis
application and administration of the State Constitution and Laws, that state of New York
Constitution Article III  mandates express:

(i.)     the use of 50 Senate Districts not 62 Senate Districts;

(ii.)    the municipalities of Hamilton shall elect together with Fulton – DON'T;

(iii.)   the city of New York shall not have more than one-third of all senators, has 24
         of 62 Senate Districts coterminous within, must not exceed 16 of 50; and

(iv.)    the People resident within an existing county are without at least two
         Assembly Districts in no less than thirty-seven of fifty-seven municipalities.

That Movants have shown prima facie evidence of statewide reapportionment injury
alleging disproportionate diminished dilution of U.S. Citizen expectation of effective electoral
participation with speech and association infringement is sufficient cause for notification of
the Honorable Chief District Judge Frederick Scullin to convene a 28 USC 2284 panel.

3

**THEREFORE IT IS HEREBY ORDERED**, that sufficient grounds exist to convene a 28 USC §2284 panel, and the clerk of the court is ordered hereby to deliver a copy of this order to the Honorable Chief Judge Frederick Scullin for administrative action to create the panel with a schedule to coincide with the preliminary hearing to show cause, herein.

In the matter of Movants request for temporary stay and restraint of all state and or territory submissions by the January 1, 2006 HAVA deadline to USDOJ and EAC pending hearing on constitutionality of HAVA "VAP" use rather than "CVAP" in the matter of state reimbursement, and allege without nationwide restraint, causes irreparable harm and injury to Plaintiffs and CVAP nationally, by the alleged unconstitutionality of HAVA Section 101:

1.  That Movants prima facie evidence, shows that Congress and Defendants and those authorities of the other states of the several states act under the 2002 HAVA Section 101 for state reimbursement formula use VAP rather than CVAP without the civilly dead;

2.  That Movants allege injury by Defendants use of VAP rather than CVAP results in significant underpayment due the state of New York thereby burdening real property owners and People including Plaintiffs by improper reimbursement going to other states and or territories instead, would constitute a false claims billing, and

3.  That Movants show irreparable harm would result, if VAP use rather than CVAP use were unequal protection and denial of substantive due process for eligible voters on both an interstate and intrastate basis, and

4.  That Movants show by reason of the facts imminent irreparable harm and injury may befall those plaintiffs, people and CVAP similarly situated if a nationwide stay of the respective state compliance plan submission until hearing were not afforded, would complicate the process to correct an ill-conceived submission, without a nationwide stay;

4

5.   That Movants have shown that in the state of New York, disruption of CVAP Bottom-up suffrage, Homerule autonomy within the various municipalities entitled to a municipal board of elections, may directly contribute to real property takings by disproportionate HAVA compliance funding distribution nationwide and statewide;

6.   That Movants have shown a likelihood of success by remedy relief available to this court, and that relief would prevent infringement of U.S. Citizen's speech, association, lessen property takings alleged to burden individual rights differently on an entity by entity and district by district basis, and cause individual disproportionate diminished dilution of suffrage franchise for those similarly situated differently on an entity by entity basis.

**THEREFORE IT IS HEREBY ORDERED** pending hearing on the constitutionality of Section 101 of HAVA definition and use of "*Voting Age Population*" nationally for calculating proportional amounts of reimbursement to each and every state of the several states and/or territories, Defendants their agents and those acting under their authority are hereby temporarily restrained from submitting the respective *state-compliance-plan* to the USDOJ and or EAC before January 1, 2006 or after hearing pending decision on preliminary injunction; however may continue to provide due process in preparation for such submission;

**IT IS FURTHER ORDERED** That The United States  Election Assistance Commission by its Director and General Counsel shall notify the respective authority of each state of the several states and/or territories of compliance deadline stay pending decision; and

**IT IS FURTHER ORDERED** that the United States Election Assistance Commission by its Director and General Counsel shall duly serve notice upon the secretary of

5

state and or directors of elections for every state of the several states and or territories of this order and papers on which it is based;

**IT IS FURTHER ORDERED** that the New York State Secretary of State and or his/her agents shall duly serve notice upon the respective corporation counsel of each and every municipal entity entitled to a board of elections with this order and papers on which it is based in a manner prescribed by NYS Civil Practice Law Rules for jurisdiction by this court;

**IT IS FURTHER ORDERED** that the New York State Board of Elections and or his/her agents shall duly serve notice upon the respective municipal board of elections corporation of each and every municipal entity including in the city of New York with this order and papers on which it is based in a manner prescribed by NYS Civil Practice Law Rules for jurisdiction by this court;

And

**IT IS** ~~HEREBY FURTHER~~ *HEREBY* **ORDERED**, that the above named defendants show *CAUSE* before this Court, at ~~Room~~ *COURTROOM #1*, James T. Foley Courthouse, 445 Broadway, Albany, New York, on *FRIDAY, DECEMBER 16,* 2005, at *9:30* o'clock in the *FORE* noon thereof, or as soon thereafter as counsel may be heard, why a preliminary injunction order should not be issued pursuant to Federal Rules of Civil Procedure ("FRCvP") 65 revising the state plan compliance deadline based upon the determination of use of CVAP rather than VAP for HAVA reimbursement for implementation of election improvements for the 2006 election cycle in preparation for the 2008 Federal Elections deadline. *AND, FURTHERMORE, ADDRESSING THE ISSUE OF THE CONVENING OF A THREE-JUDGE PANEL, PURSUANT TO 28 U.S.C. §2284.*

**IT IS FURTHERMORE ORDERED** that a copy of this order, together with the papers upon which it is granted, be personally served upon the defendants or their attorney on or before _WEDNESDAY, NOVEMBER 30_, 2005, by _H. WILLIAM VAN ALLEN_ and that such service be deemed good and sufficient.

SO ORDERED.

Dated: Albany, New York
     November 2-9, 2005

LAWRENCE E. KAHN
United States District Judge

```
***The response deadline is: 12/12/05.  The reply to the
   response deadline is: 12/14/05.
```

# EXHIBIT D

Send Log

| Status | At | Type | Pr | Name | Date | Company | Pages |
|---|---|---|---|---|---|---|---|
| Comp | Fax | S | | Flaherty, Rich | Sun 12/11/2005 8:14 PM | WBNR-AM 1260 | 7 |
| Comp | Fax | S | | Poughkeepsie Journal | Sun 12/11/2005 8:07 PM | Poughkeepsie Journal | 7 |
| Comp | Fax | S | | Brooks, Paul | Sun 12/11/2005 8:03 PM | Times Herald Record (Highland Bure... | 7 |
| Comp | Fax | S | | Office, Middletown | Sun 12/11/2005 7:57 PM | Times Herald Record | 7 |
| Failed | Fax | S | | Hendrix, Cameron | Sun 12/11/2005 7:56 PM | Clear Channel | 7 |
| Comp | Fax | S | | Hollander, Brian | Sun 12/11/2005 7:51 PM | Ulster Publishing | 7 |
| Comp | Fax | S | | Benjamin, Elizabeth | Sun 12/11/2005 7:45 PM | Albany Times Union | 7 |
| Comp | Fax | S | | GORMLEY, MICHAEL | Sun 12/11/2005 7:42 PM | Associated Press | 7 |
| Comp | Fax | S | | Humbert, Marc | Sun 12/11/2005 7:38 PM | Associated Press | 7 |
| Failed | Fax | S | | Hammond, Bill | Sun 12/11/2005 7:37 PM | Daily Gazette | 7 |
| Comp | Fax | S | | Flood, Betty | Sun 12/11/2005 7:31 PM | Cuyler New Service | 7 |
| Comp | Fax | S | | Lynch, Dan | Sun 12/11/2005 7:26 PM | WROW | 7 |
| Comp | Fax | S | | Editor | Sun 12/11/2005 7:20 PM | New York Daily News | 7 |
| Comp | Fax | S | | Empire Information Services | Sun 12/11/2005 7:15 PM | Empire Information Services | 7 |
| Comp | Fax | S | | Roy, Yancy | Sun 12/11/2005 7:10 PM | Gannett News Service | 7 |
| Failed | Fax | S | | Gazette Newspapers | Sun 12/11/2005 7:09 PM | Gazette Newspapers | 7 |
| Comp | Fax | S | | Inside Albany | Sun 12/11/2005 7:02 PM | Inside Albany | 7 |
| Comp | Fax | S | | Jochnowitz, Jay | Sun 12/11/2005 6:57 PM | Albany Times Union | 7 |
| Comp | Fax | S | | Bechtel, John | Sun 12/11/2005 6:53 PM | Legislative Gazette, The | 7 |
| Comp | Fax | S | | DeWitt, Karen | Sun 12/11/2005 6:49 PM | NYS Public Radio Network | 7 |
| Comp | Fax | S | | Caher, John | Sun 12/11/2005 6:43 PM | New York Law Journal | 7 |
| Comp | Fax | S | | Bureau, Capitol | Sun 12/11/2005 6:38 PM | Newsday | 7 |
| Comp | Fax | S | | Ottaway News Service | Sun 12/11/2005 6:34 PM | Ottaway News Service | 7 |
| Failed | Fax | S | | Perez-Pena, Richard | Sun 12/11/2005 6:33 PM | New York Times | 7 |
| Comp | Fax | S | | Gavin, Robert | Sun 12/11/2005 6:27 PM | Staten Island Advance | 7 |
| Comp | Fax | S | | Kriss, Erik | Sun 12/11/2005 6:22 PM | Syracuse Herald-Journal/ Post-Stand... | 7 |
| Comp | Fax | S | | Precious, Tom | Sun 12/11/2005 6:17 PM | Buffalo News | 7 |

Send Log

| Statu: | At | Type | Pr | Name | Date | Company | Pages |
|---|---|---|---|---|---|---|---|
| Comp | Fax | S | | WGY Radio | Sun 12/11/2005 6:11 PM | WGY Radio | 7 |
| Comp | Fax | S | | Zahn, Benita | Sun 12/11/2005 6:07 PM | WNYT TV | 7 |
| Comp | Fax | S | | WRGB TV | Sun 12/11/2005 6:04 PM | WRGB TV | 7 |
| Comp | Fax | S | | Yates County Board of Elections | Sun 12/11/2005 5:58 PM | Yates County Board of Elections | 6 |
| Comp | Fax | S | | Westchester County Board of Elections | Sun 12/11/2005 5:55 PM | Westchester County Board of Elections | 6 |
| Comp | Fax | S | | Wayne County Board of Elections | Sun 12/11/2005 5:50 PM | Wayne County Board of Elections | 6 |
| Comp | Fax | S | | Washington County Board of Elections | Sun 12/11/2005 5:44 PM | Washington County Board of Elections | 6 |
| Comp | Fax | S | | Ulster County Board of Elections | Sun 12/11/2005 5:38 PM | Ulster County Board of Elections | 6 |
| Comp | Fax | S | | Tompkins County Board of Elections | Sun 12/11/2005 5:34 PM | Tompkins County Board of Elections | 6 |
| Comp | Fax | S | | Tioga County Board of Elections | Sun 12/11/2005 5:30 PM | Tioga County Board of Elections | 6 |
| Comp | Fax | S | | Sullivan County Board of Elections | Sun 12/11/2005 5:23 PM | Sullivan County Board of Elections | 6 |
| Comp | Fax | S | | Suffolk County Board of Elections | Sun 12/11/2005 5:20 PM | Suffolk County Board of Elections | 6 |
| Failec | Fax | S | | Steuben County Board of Elections | Sun 12/11/2005 5:19 PM | Steuben County Board of Elections | 6 |
| Comp | Fax | S | | St. Lawrence County Board of E | Sun 12/11/2005 5:14 PM | St. Lawrence County Board of Elections | 6 |
| Comp | Fax | S | | Seneca County Board of Elections | Sun 12/11/2005 5:07 PM | Seneca County Board of Elections | 6 |
| Comp | Fax | S | | Schuyler County Board of Elections | Sun 12/11/2005 4:59 PM | Schuyler County Board of Elections | 6 |
| Comp | Fax | S | | Schoharie County Board of Elections | Sun 12/11/2005 4:53 PM | Schoharie County Board of Elections | 6 |
| Comp | Fax | S | | Schenectady County Board of Elections | Sun 12/11/2005 4:48 PM | Schenectady County Board of Elections | 6 |
| Comp | Fax | S | | Saratoga County Board of Elections | Sun 12/11/2005 4:43 PM | Saratoga County Board of Elections | 6 |
| Comp | Fax | S | | Rockland County Board of Elections | Sun 12/11/2005 4:38 PM | Rockland County Board of Elections | 6 |
| Comp | Fax | S | | Rensselaer County Board of Elections | Sun 12/11/2005 4:31 PM | Rensselaer County Board of Elections | 6 |
| Comp | Fax | S | | Putnam County Board of Elections | Sun 12/11/2005 4:28 PM | Putnam County Board of Elections | 6 |
| Comp | Fax | S | | Otsego County Board of Elections | Sun 12/11/2005 4:23 PM | Otsego County Board of Elections | 6 |
| Comp | Fax | S | | Oswego County Board of Elections | Sun 12/11/2005 4:18 PM | Oswego County Board of Elections | 6 |
| Comp | Fax | S | | Orleans County Board of Elections | Sun 12/11/2005 4:06 PM | Orleans County Board of Elections | 6 |
| Failec | Fax | S | | Orange County Board of Elections | Sun 12/11/2005 4:02 PM | Orange County Board of Elections | 6 |
| Comp | Fax | S | | Ontario County Board of Elections | Sun 12/11/2005 3:58 PM | Ontario County Board of Elections | 6 |

Send Log

| Status | At | Type | Pr | Name | Date | Company | Pages |
|--------|-----|------|-----|------|------|---------|-------|
| Comp | Fax | S | | Onondaga County Board of Elections | Sun 12/11/2005 3:53 PM | Onondaga County Board of Elections | 6 |
| Failed | Fax | S | | Oneida County Board of Elections | Sun 12/11/2005 3:50 PM | Oneida County Board of Elections | 6 |
| Comp | Fax | S | | Niagara County Board of Elections | Sun 12/11/2005 3:45 PM | Niagara County Board of Elections | 6 |
| Comp | Fax | S | | New York City Board of Elections | Sun 12/11/2005 3:42 PM | New York City Board of Elections | 6 |
| Comp | Fax | S | | Nassau County Board of Elections | Sun 12/11/2005 3:37 PM | Nassau County Board of Elections | 6 |
| Comp | Fax | S | | Montgomery County Board of Elections | Sun 12/11/2005 3:33 PM | Montgomery County Board of Elections | 6 |
| Comp | Fax | S | | Monroe County Board of Elections | Sun 12/11/2005 3:28 PM | Monroe County Board of Elections | 6 |
| Failed | Fax | S | | Madison County Board of Elections | Sun 12/11/2005 3:28 PM | Madison County Board of Elections | 6 |
| Comp | Fax | S | | Livingston County Board of Elections | Sun 12/11/2005 3:25 PM | Livingston County Board of Elections | 6 |
| Comp | Fax | S | | Jefferson County Board of Elections | Sun 12/11/2005 3:20 PM | Jefferson County Board of Elections | 6 |
| Comp | Fax | S | | Herkimer County Board of Elections | Sun 12/11/2005 3:13 PM | Herkimer County Board of Elections | 6 |
| Comp | Fax | S | | Hamilton County Board of Elections | Sun 12/11/2005 3:09 PM | Hamilton County Board of Elections | 6 |
| Comp | Fax | S | | Greene County Board of Elections | Sun 12/11/2005 3:05 PM | Greene County Board of Elections | 6 |
| Comp | Fax | S | | Genesee County Board of Elections | Sun 12/11/2005 3:00 PM | Genesee County Board of Elections | 6 |
| Comp | Fax | S | | Fulton County Board of Elections | Sun 12/11/2005 2:54 PM | Fulton County Board of Elections | 6 |
| Failed | Fax | S | | Franklin County Board of Elections | Sun 12/11/2005 2:40 PM | Franklin County Board of Elections | 6 |
| Failed | Fax | S | | Essex County Board of Elections | Sun 12/11/2005 2:40 PM | Essex County Board of Elections | 6 |
| Failed | Fax | S | | Erie County Board of Elections | Sun 12/11/2005 2:39 PM | Erie County Board of Elections | 6 |
| Comp | Fax | S | | Dutchess County Board of Elections | Sun 12/11/2005 2:34 PM | Dutchess County Board of Elections | 6 |
| Comp | Fax | S | | Delaware County Board of Elections | Sun 12/11/2005 2:28 PM | Delaware County Board of Elections | 6 |
| Comp | Fax | S | | Cortland County Board of Elections | Sun 12/11/2005 2:23 PM | Cortland County Board of Elections | 6 |
| Comp | Fax | S | | Columbia County Board of Elections | Sun 12/11/2005 2:16 PM | Columbia County Board of Elections | 6 |
| Failed | Fax | S | | Clinton County Board of Elections | Sun 12/11/2005 2:16 PM | Clinton County Board of Elections | 6 |
| Comp | Fax | S | | Chenango County Board of Elections | Sun 12/11/2005 2:11 PM | Chenango County Board of Elections | 6 |
| Comp | Fax | S | | Chemung County Board of Elections | Sun 12/11/2005 2:06 PM | Chemung County Board of Elections | 6 |
| Comp | Fax | S | | Chautauqua County Board of Elections | Sun 12/11/2005 2:01 PM | Chautauqua County Board of Elections | 6 |
| Comp | Fax | S | | Cayuga County Board of Elections | Sun 12/11/2005 1:58 PM | Cayuga County Board of Elections | 6 |

Send Log

| Status | At | Type | Pr | Name | Date | Company | Pages |
|---|---|---|---|---|---|---|---|
| Comp | Fax | S | | Cattaraugus County Board of Elections | Sun 12/11/2005 1:52 PM | Cattaraugus County Board of Elections | 6 |
| Comp | Fax | S | | Broome County Board of Elections | Sun 12/11/2005 1:47 PM | Broome County Board of Elections | 6 |
| Comp | Fax | S | | Allegany County Board of Elections | Sun 12/11/2005 1:41 PM | Allegany County Board of Elections | 6 |
| Failed | Fax | S | | Albany County Board of Elections | Sun 12/11/2005 1:40 PM | Albany County Board of Elections | 6 |
| Comp | Fax | S | | Indelicato, Charlene | Sun 12/11/2005 1:37 PM | Westchester County (County Attorney... | 6 |
| Comp | Fax | S | | Attorney, (Warren County) | Sun 12/11/2005 1:32 PM | Warren County | 6 |
| Comp | Fax | S | | Attorney, (Ulster County) | Sun 12/11/2005 1:27 PM | Ulster County | 6 |
| Failed | Fax | S | | Attorney, (Sullivan County) | Sun 12/11/2005 1:26 PM | Sullivan County | 6 |
| Failed | Fax | S | | Malafi, Christine | Sun 12/11/2005 1:25 PM | Suffolk County (County Attorney) | 6 |
| Comp | Fax | S | | Zugibe, Patricia | Sun 12/11/2005 1:21 PM | Rockland County (County Attorney) | 6 |
| Comp | Fax | S | | Count-Attorney | Sun 12/11/2005 1:16 PM | Orange County (County Attorney) | 6 |
| Comp | Fax | S | | Attorney, (Onondaga County) | Sun 12/11/2005 1:11 PM | Onondaga County | 6 |
| Comp | Fax | S | | Goodman, Lorna | Sun 12/11/2005 1:08 PM | Nassau County (County Attorney) | 6 |
| Failed | Fax | S | | Attorney, (Monroe County) | Sun 12/11/2005 1:07 PM | Monroe County | 6 |
| Comp | Fax | S | | Hartzell, John | Sun 12/11/2005 1:02 PM | Jefferson County | 6 |
| Comp | Fax | S | | Attorney, (Erie County) | Sun 12/11/2005 12:57 PM | Erie County | 6 |
| Failed | Fax | S | | Wozniak, Ronald | Sun 12/11/2005 12:56 PM | Dutchess County (County Attorney) | 6 |
| Comp | Fax | S | | Attorney, (Broome County) | Sun 12/11/2005 12:51 PM | Broome County | 6 |
| Comp | Fax | S | | Joyce, Amy | Sun 12/11/2005 12:47 PM | Albany County Department of Law | 6 |

.

Page 4

# EXHIBIT E



**Otsego County Attorney's Office**
County Office Building
197 Main Street
Cooperstown, New York 13326-1129
Telephone: (607) 547-4208
Fax: (607) 547-7572

December 23, 2005

TO THE PLAINTIFFS ON THE ATTACHED LIST:

Re:    Loeber, et al vs. Spargo, et al
       Case 04-CV-1193 (LEK-RFT)

Gentlemen:

I enclose a Notice of Appearance and Demand on behalf of the Otsego County Board of Elections regarding the above-captioned matter.

Very truly yours,

JAMES E. KONSTANTY
County Attorney

JEK/nk
Encl.

**PLAINTIFFS**

**RONALD G. LOEBER**
2130 Berne Altamont Road
Altamont, NY 12009

**BURR V. DEITZ,**
444 Whitehall Street
Albany, NY 12208

**WILLIAM E. BOMBARD**
P.O. Box 882
Glens Falls, NY 12801

**WILLIAM A. GAGE**
10 Greenfield Lane
Hampton, NY 12837

**JOHN JOSEPH FORJONE**
P.O. Box 28
Clarendon, NY 14428

**H. WILLIAM VanALLEN**
315 North Road
Hurley, NY 12443

**FAIRLENE G. RABENDA**
8 Claudia Lane
Poughkeepsie, NY 12603

**ROY-PIERRE DETIEGE-CORMIER**
25 Hattie Jones Circle
Brooklyn, NY 11213

**RONALD E. SACOFF**
84 Boylan Street
Staten Island, NY 10312

**GABRIEL RASSANO**
135 Gordon Place
Freeport, NY 11520

**EDWARD M. PERSON, JR.**
392 Seldane Avenue
North Babylon, NY 11703

**CHRISTOPHER EARL STRUNK**
351 North Road
Hurley, NY 12443

---

**AD HOC NYS CITIZENS FOR
CONSTITUTIONAL LEGISLATIVE
REDISTRICTING**
315 North Road. Hurley. NY 12443

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------X
In the 42 USC 1983 suffrage and autonomy discrimination
Matter of: Ronald G. Loeber, Burr B. Dietz, William E.
Bombard, William A. Gage, John Joseph Forjone, H. William
Van Allen, Fairlene G. Rabenda, Roy-Pierce Detiege-Cormier,
Ronald E. Sacoff, Gabriel Razzano, Edward M. Person, Jr.,
Christopher Earl Strunk and
The AD HOC New York State Citizens for Constitutional
Legislative Redistricting,

                                 Petitioners/Plaintiffs

                                                        Case 04-CV-1193
                                                        (LEK/RFT)

-against-                                               NOTICE OF APPEARANCE
                                                        AND DEMAND

THOMAS J. SPARGO, individually and all 264 Justices of
the State Supreme Court, JOSEPH L. BRUNO, 61 JOHN and
JANE DOE SENATORS; SHELDON SILVER, 149 JOHN
and JANE ASSEMBLY MEMBERS; GEORGE E. PATAKI;
RANDY A. DANIELS, NYS Secretary of State, ELIOT
SPITZER; THE NEW YORK STATE BOARD OF ELECTIONS,
and every Municipal Board of Elections within 57 Counties
by every Corporation Counsel of: SUFFOLK, NASSAU, WESTCHESTER,
ROCKLAND, ORANGE, ALBANY, DUTCHESS, MONROE, ERIE,
ONONDAGA, NIAGARA, ONEIDA, ALLEGANY, BROOME,
CHAUTAUQUA, CATTARAUGUS, CAYUGA, CHEMUNG, CORTLAND,
CHENANGO, COLUMBIA, TIOGA, TOMPKINS, SCHUYLER, STEUBEN,
LIVINGSTON, ONTARIO, YATES, SENECA, WAYNE, OSWEGO,
ORLEANS, GENESEE, WYOMING, JEFFERSON, LEWIS, MADISON,
HERKIMER, OTSEGO, ST. LAWRENCE, FRANKLIN, CLINTON,
ESSEX, MONTGOMERY, WARREN, SARATOGA, WASHINGTON,
RENSSELAER, GREENE, ULSTER, DELAWARE, PUTNAM, HAMILTON,
FULTON, SCHENECTADY, SCHOHARIE, SULLIVAN and THE CITY
OF NEW YORK; MICHAEL BLOOMBERG; UNITED STATES ELECTION
ASSISTANCE COMMISSION; THOMAS R. WILKEY; THE NATIONAL
ASSOCIATION OF SECRETARIES OF STATE by LESLIE REYNOLDS;
PETER KOSINSKI; and ALBERTO GONZALEZ,

                                 Respondents/Defendants
------------------------------------------------------------------------------------X

SIR:

PLEASE TAKE NOTICE, that the Defendant, the OTSEGO COUNTY BOARD OF ELECTIONS, hereby appears in the above-entitled action, and that James E. Konstanty is retained as Attorney for the OTSEGO COUNTY BOARD OF ELECTIONS, and demands that a copy of the Complaint and Amended Complaint and all papers in this action be served on the undersigned at the Otsego County Office Building, 197 Main Street, Cooperstown, New York 13326.

Dated:  December 22, 2005.

Yours, etc.

JAMES E. KONSTANTY
Otsego County Attorney
Attorney for the Defendant,
Otsego County Board of Elections
Office and PO Address
197 Main Street
County Office Building
Cooperstown, NY  13326
(607) 547-4208

TO: See attached list

/IFFS

/NALD G. LOEBER
.130 Berne Altamont Road
Altamont, NY 12009

BURR V. DEITZ,
444 Whitehall Street
Albany, NY 12208

WILLIAM E. BOMBARD
P.O. Box 882
Glens Falls, NY 12801

WILLIAM A. GAGE
10 Greenfield Lane
Hampton, NY 12837

JOHN JOSEPH FORJONE
P.O. Box 28
Clarendon, NY 14428

H. WILLIAM VanALLEN
315 North Road
Hurley, NY 12443

FAIRLENE G. RABENDA
8 Claudia Lane
Poughkeepsie, NY 12603

ROY-PIERRE DETIEGE-CORMIER
25 Hattie Jones Circle
Brooklyn, NY 11213

RONALD E. SACOFF
84 Boylan Street
Staten Island, NY 10312

GABRIEL RASSANO
135 Gordon Place
Freeport, NY 11520

EDWARD M. PERSON, JR.
392 Seldane Avenue
North Babylon, NY 11703

CHRISTOPHER EARL STRUNK
351 North Road
Hurley, NY 12443

AD HOC NYS CITIZENS FOR
CONSTITUTIONAL LEGISLATIVE
REDISTRICTING
315 North Road. Hurley. NY 12443

# EXHIBIT F



**U.S. Department of Justice**

Civil Rights Division

_____

*Office of the Assistant Attorney General*                                   *Washington, D.C. 20530*

JAN 10 2006

The Honorable Eliot Spitzer
Attorney General
The Capitol
Albany, New York 12224-0341

Todd Valentine, Esq.
General Counsel
New York State Board of Elections
40 Steuben Street
Albany, New York 12207

Dear Messrs. Spitzer and Valentine:

     I have authorized the filing of a lawsuit on behalf of the United States against the State of New York as well as the New York State Board of Elections, *et al*, pursuant to Sections 301 and 303(a) of the Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. §§ 15481 and 15483(a). Section 401 of HAVA, 42 U.S.C. § 15511, authorizes the Attorney General to bring an action in federal district court for such declaratory and injunctive relief as is necessary to carry out the requirements of Title III of HAVA.

     Section 301 of HAVA, 42 U.S.C. § 15481, sets forth voting systems standards for all states for each voting system used in an election for Federal office. Among other things, Section 301 requires that voting systems provide a mechanism for a voter to verify and, where necessary, correct his or her ballot, notify a voter of an overvote, produce a permanent paper record with a manual audit capacity, comply with federal error rate standards, and provide for accessibility for voters with disabilities or with alternative language needs. Section 301 became effective on January 1, 2006.

     Section 303(a) of HAVA, 42 U.S.C. § 15483(a), requires all states except a state which does not maintain voter registration for elections for federal office to implement a single, uniform, official, centralized, interactive computerized statewide voter registration list for use in elections for Federal office. Among other things, this list must be defined, maintained and administered at the state level, must contain the name and registration information of every

- 2 -

legally registered voter in the state, must have a unique identifier for each voter, must be coordinated with other state databases, must meet list maintenance, technological security and accuracy requirements, and must meet verification requirements for all new registered voters. Section 303(a) became effective in New York on January 1, 2006, since New York applied to the U.S. Election Assistance Commission for a waiver of compliance.

As you are aware, attorneys from the Civil Rights Division have met with the staff of the State Board of Elections, as well as staff from the State Legislature, on several occasions over the last two years to discuss New York's efforts to comply with HAVA's mandates. At those meetings, as well as in numerous telephone conversations, and also in written correspondence, we have expressed our concerns about the lack of progress made by New York in moving toward full HAVA compliance. It is beyond dispute that New York is not now in compliance with either the statewide voter registration list requirements of Section 303(a) of HAVA, or the voting system standards of Section 301 of HAVA. In fact, based on information we received at our most recent meeting on December 2, 2005, it is clear that New York is not close to approaching full HAVA compliance and, in our view, is further behind in that regard than any other state in the country.

We are hopeful that we will be able to resolve this matter through a negotiated consent decree rather than through costly and protracted litigation. We request that you contact us as soon as possible to indicate whether the State is willing to enter into negotiations for a fair and equitable settlement of this matter that will remedy these violations. To that end, we are prepared to meet with the State promptly to discuss terms of a possible consent decree. We are prepared to file a complaint if the matter is not resolved expeditiously.

Please contact Brian Heffernan (202-514-4755) in our Voting Section, concerning the State's intentions or for any questions you may have. We look forward to working with you to achieve a prompt resolution of this matter.

Sincerely,

Wan J. Kim
Assistant Attorney General

cc:  Honorable George E. Pataki

# EXHIBIT G

**Amended**

**Minutes of The New York State Board of Elections**
**Tuesday, January 10, 2006**

The regular meeting of the Commissioners of the New York State Board of Elections was called to order at 12:15 p.m. at the office of the New York State Board of Elections, 40 Steuben Street, 4th Floor, Albany, New York 12207. Commissioners present were: Co-Chairman Doug Kellner, Co-Chairman Neil Kelleher, and Evelyn Aquila . Staff present were Peter Kosinski, Stanley Zalen, Todd Valentine, Anna Svizzero, Lee Daghlian, George Stanton, Michael Johnson, Pat Murray, Pat Tracey and Bill McCann. Guest sign in sheet is attached.

<u>**Minutes of December 15, 2005**</u> - tabled

<u>**Unit Update:**</u>

- <u>**Legal Unit:**</u> Mr. Valentine reported that the 45 day comment period for the machine regulations will be over on Monday, January 23, 2006. At that time, a final review and segregation of all those comments will be made by staff. A memo of a synopsis of the comments will be provided to the Board Commissioners. The Chairman had assumed that this synopsis would be made available at this meeting but it will not be made available until later. Todd also stated that the transcripts of the public hearings will be made available when received and will then be posted on our website. Commissioner Kellner raised concerns about the delay in distribution of the summaries. He noted that he had not yet received the transcript of the Albany hearing; staff committed to provide it by January 11, 2006.Commissioner Kellner also stated that he and the other Commissioners should have access to all public comments, testimonies and e-mailed comments.

- <u>**Election Operations:**</u>. Anna Svizzero reports the unit is busy with receiving and reviewing the comments about the regulations and also preparing the time frame for the certification of machines. She also stated that all the post-election data collection and certification has been done. She expects there to be 7 special elections to fill vacancies in the Legislature in February. She presented a time line for HAVA voting machine implementation that she and her staff have developed as requested by the Board Commissioners and that document is attached. Commissioner Kellner stated that the time line was unacceptable as there isn't enough time after receiving new machines to enable the counties to prepare for the election. The time line will be reworked. Mr. Kosinski asked Anna how long it would take to certify a machine. Anna responded that it would take about 30 days for each machine. She felt that with an increase in staffing, they could do two machines at the same time. Commissioner Kellner asked her if we had a protocol at this time on exactly what the procedure will be. Anna responded no, but will have a protocol when the machine is delivered. At that time a test plan will be devised for each particular machine. Anna stated that Ciber, Inc. is the independent testing lab and at this

point Commissioner Kellner stated that he needs copies of any plans that have to do with this process. Mr. Kosinski asked Anna if the vendors are indicating when they will be delivering machines. Anna's response was no but she felt that Sequoia, Liberty and ES&S are the only three machine vendors that she has ongoing relationships with and that there could be others bringing machines. Commissioner Aquila asked if Opti-Scan type machines will also be presented for certification. Anna Svizzero said yes. Companies that have both DRE or Opti-Scan will present both for certification. The Commissioner directed Anna Svizzero to contact all potential vendors to begin coordination for the certification process.

- **NVRA/PIO:** Lee Daghlian reported that his office is busy accepting and copying e-mail requests particularly for comments on the regulations and machine purchases in general. He also stated his unit is very busy answering phones along with the additional work required because of the filing of local filers for the campaign finance system. He also stated that the authorized execution of the application for the state fair in late September has been done.

- **ITU:** George Stanton stated that we appear to be ready with the local filing system and that they had already received some early filings . He also stated that the patch set up with New York City Campaign Finance Board seems to be working fine and that there is compatibility. George also stated that there is a new mapping system that was developed by Caliper Corporation that is up and running on the web site. This is a system which the public can use to look up their elected officials and also locate district maps. This system has a lot more information available to include demographic information. George also stated that in his work with Gartner, that they have set up several committees for work on the database base, the governance, the policy committee, which will be meeting in Cooperstown, NY, a standards committee and also a grants committee. He stated that he's been in touch several times with Washington State on how to transfer their system to New York State. They will be meeting in Washington State on January 31, 2006 to specifically look at the system in King County in the Seattle area, to make this transfer happen. He's also setting up a road map to use when developing our system to highlight the areas where a Board decision is required so that everyone is on the same map. George is also devising a temporary interim solution to meet the requirement that there be a statewide database in place for the primary in September. He's attached a memo which outlines what he feels we can do to meet that requirement. There will be some extra costs for the software and licensing that could approach the $100,000 range. Commissioner Kellner stated that we will need written rules and regulations for this interim plan as well as the final solution.

- **Enforcement/Campaign Finance:** Michael Johnson reported that there has been heavy support and communications from local filers who are complying with the requirements of New York State law. His staff is extremely busy answering calls and providing the proper answers to local filers. We will be able to view on our website local filers and search for them by office and county. There are a few issues to be addressed in New York

City regarding compatibility.

**Old Business:** There was no old business.

**New Business:** There was no new business.

- At this point, Barbara Murphy, a guest at the meeting, requested to make a public comment. She was granted a few minutes and she supported the Optic-Scan voting machine. Since she had already given testimony at a public hearing held by the Board, the Commissioners asked her to keep it brief.

The Board moved 3-0 to move to Executive session at 1:20 p.m. to discuss cases and any personnel matters.

**The Executive Session adjourned 2:20p.m.** Cases were discussed and voted on. There were no personnel matters discussed.

**Preliminary Determinations**
CMP04-03 - closed
CMP04-09 - closed
CMP04-29 - open
CMP04-35 - closed
CMP05-26 - closed
CMP04-69 - tabled
CMP05-06- closed & CMP05-07 - tabled
CMP05-11- closed

**Complaints Without Preliminary Determination**
CMP03-18- closed
CMP04-24- tabled
CMP04-70- closed
CMP05-47 - closed
CMP05-75- closed
CMP05-76 -closed

**Final Determination**
CMP04-39- closed

**Proposed**

**Minutes of The New York State Board of Elections**
**Tuesday, January 31, 2006**

The regular meeting of the Commissioners of the New York State Board of Elections was called to order at 12:30 p.m. at the office of the New York State Board of Elections, 40 Steuben Street, 4th Floor, Albany, New York 12207. Commissioners present were: Co-Chairman Doug Kellner, Co-Chairman Neil Kelleher, and Evelyn Aquila . The meeting was chaired by Commissioner Kelleher. Staff present were Peter Kosinski, Stanley Zalen, Todd Valentine, Anna Svizzero, Lee Daghlian, Dan Valvo, Michael Johnson, Pat Murray, Pat Tracey and Bill McCann. Guest sign in sheet is attached.

**Minutes of December 15, 2005 and January 10, 2006** - tabled for further amendments.

**Unit Update:**

- **Legal Unit:** Mr. Valentine reported on the decision in the Brennan Center case concerning the nomination of state supreme court justices. The Court ruled in their favor. There was a discussion on whether we should appeal the case. Mr. Valentine stated that all parties recommended appeal. The Commissioners agreed 3-0. The court has asked for our suggestions on the petition process for judges. State Board staff are preparing recommendations for the signature requirements for this process. Todd also stated that we are sending data to the Department of Justice (DOJ) that was requested. Regarding HAVA, Commissioner Aquila praised the staff for a job well done, particularly at the meeting with DOJ. Procurement documents are being developed for the statewide database and the voting machines which will be available to the Board soon.

- **Election Operations:.** Anna Svizzero reports that they received the nomination papers for the candidates for the two special elections that we process in the 60th Senate District and the 139th Assembly District. Candidate lists for both districts are attached. Anna also stated that her staff is still reviewing late submissions of public comments on the rules and regulations. A survey will be developed for the Commissioners to review. Security issues are being discussed with Dan Valvo and John Ferri regarding the number of voters per machine. They are having discussions with other states. Anna is looking into using students and others from outside the Agency to do time tests on actual machines, with the help of Sequoia and other manufacturers. Anna will be meeting with county commissioners on February 2, to discuss additional time for training and for the acceptance testing to further define that issue. Commissioner Kellner asked what the actual time line would be for these regulations and also have we identified the policy issues. Anna said she could make a list of all the issues for the Commissioners to vote on. Commissioner Kellner stated we need interim lists so that they can share it with disability groups as well as other concerned groups. He also suggested that once the revised

regulations are completed, they be posted on our web page for 10 days. Anna stated that she has reached out to vendors to find out their time line for delivering machines to the Board, as well as the type of machines they will be presenting for certification.

- **NVRA/PIO:** Lee Daghlian reported business as usual. His unit has been exceptionally busy with the media as well as e-mails and phone calls.

- **ITU:** Dan Valvo reported that the new work stations for the ITU unit were installed. Mr. Valvo reported that he has transactional figures for the January 15th campaign finance filing for regular as well as local filers. His report is attached. He stated that the statewide voter registration system transfer from Washington State is under way. George Stanton is currently in Washington to assist with that transfer. RFP for system integration is out and we hope to have information for the February 28 board meeting. A policy meeting is scheduled for February 8. Commissioner Kellner requested that Board Commissioners be provided an agenda for all meetings pertaining to HAVA.

- **Enforcement/Campaign Finance:** Michael Johnson discussed the local filers and the increased number of calls. The staff is working overtime to enter all data into the system as quickly as possible. He is currently devising the schedule for the campaign finance seminars in the spring, which will be held in a total of 24 counties. He is looking for additional staff to assist him with these projects.

    **Old Business:** There was no old business.

    **New Business:** Commissioner Aquila moved to hire Robert Brehm, the former Schenectady County Democratic Commissioner to fill the Assistant Director of Public Information position at the pay rate of M-2.

    Also, Commissioner Kelleher moved to hire Allison M. Carr as the Assistant Director of Election Operations at the pay rate of M-2. Both approved 3-0.

The Board moved to Executive Session at 1:15 p.m. to discuss cases and any personnel matters.

**The Executive Session adjourned 1:20p.m.** Cases were discussed and there were no personnel matters discussed.

At this time the meeting was reopened for General Session and Pat Tracey discussed the budget. The $10 million appropriation will be made by the Legislature to cover the interest earned. Commissioner Kellner said that we should do a budget and we should have George Stanton and Anna Svizzero assist in the implementation of their plans for the development of the educational and voter outreach applications for HAVA; and to submit those cost items to Pat Tracey as soon as possible. A budget must be created for the HAVA money so that the Legislature doesn't disperse it all to the counties, as some of the money needs to be allocated to the State Board as well.

There was discussion about the contracts with the ITA to make provisions that the tests are run

properly. Commissioner Kellner made several points concerning this issue that need to be discussed with the ITA and our staff to ensure that these things are happening and are made part of the regulations. Pat Murray identified five policy issues that we need to address:

- Requiring that all vendors bring all machines that they manufacture to this Board for certification.
- Whether we accept a machine for certification that's been tested to 2002 standards or 2005 standards. Staff is currently doing gap analysis to understand what the differences are between the two standards.
- the issues of radio and phone hook ups with the machines;
- the issue of the policy for under voting on machines; and
- the deadline for the counties to make their machine selections.

The State Board Commissioners must be informed of the above issues so that they are prepared to make decisions.

**The meeting was adjourned at 2:15 p.m.** The next meeting is scheduled for February 14, 2006 at Noon.

**Preliminary Determinations**

CMP04-69-closed

**Complaint Without Preliminary Determination**
CMP04-24 - closed
CMP04-42 - closed

**Final Determination**

CMP04-71-SC05-05 - closed

# EXHIBIT H

9/4 - 94=16 7
684-6554

STATE OF NEW YORK

SUPREME COURT

COUNTY OF ALBANY

_____

In the Matter of the Application of MARIO M. CASTRACAN and
VINCENT F. BONELLI, acting Pro Bono Publico,

Petitioners,

for an order pursuant to Sections 16-100, 16-102, 16-104,
16-106 and 16-116 of the Election Law,

-against-

ANTHONY M. COLAVITA, Esq., Chairman, WESTCHESTER REPUBLICAN
COUNTY COMMITTEE; GUY T. PARISI, Esq., DENNIS MEHIEL, Esq.,
Chairman, WESTCHESTER DEMOCRATIC COUNTY COMMITTEE; RICHARD
L. WEINGARTEN, Esq., LOUIS A. BREVETTI, Esq., HON. FRANCIS
A. NICOLAI, HOWARD MILLER, Esq., ALBERT J. EMANUELLI, Esq.,
R. WELLS STOUT, HELENA DONAHUE, EVELYN AQUILA, Commissioners
constituting the NEW YORK STATE BOARD OF ELECTIONS,
ANTONIA R. D'APICE, MARION B. OLDI, Commissioners constituting
the WESTCHESTER COUNTY BOARD OF ELECTIONS,

Respondents,

for an order declaring invalid the Certificates purporting
to designate Respondents HON. FRANCIS A. NICOLAI and HOWARD
MILLER, Esq., as candidates for the office of Justice of
the Supreme Court of the State of New York, Ninth Judicial
District, and the Petitioners purporting to designate ALBERT
J. EMANUELLI, Esq. a candidate for the office of Surrogate
of Westchester County to be held in the general election
of November 6, 1990.

_____

Supreme Court - Request for Judicial Intervention

October 12, 1990-Special Term   RJI 0190 ST2747   Index No. 6056-90

JUSTICE LAWRENCE E. KAHN, Presiding

APPEARANCES:

Doris L. Sassower, P.C.
Attorney for petitioners
283 Soundview Avenue
White Plains, New York 10606
(914) 997-1677

-1A-

APPEARANCES:   (Continued)


Thomas J. Abinanti, Esq.
Attorney for NICOLAI
Six Chester Avenue
White Plains, New York 10601
(914) 328-9000

Marilyn J. Slaatten, Esq.
County Attorney
Attorney for D'APICE & OLDI
Michaelian Office Building
148 Martine Avenue
White Plains, New York 10601
(914) 285-2696

Scolari, Brevetti, Goldsmith & Weiss, P.C.
Attorneys for BREVETTI
230 Park Avenue
New York, New York 10169
(212) 370-1000

Guy T. Parisi, Esq.
112 Woods End Road
Chappaqua, New York 10514
(914) 238-5048

Hall, Dickler, Lawler, Kent & Friedman
Sam Yasgur, Esq.
Attorneys for EMANUELLI
11 Martine Avenue
White Plains, New York 10606
(914) 428-3232

Aldo V. Vitagliano, P.C.
150 Purchase Street
Rye, New York 10580
(914) 921-0333

Hashmall, Sheer, Bank & Geist
Attorneys for MEHIEL, WESTCHESTER DEMOCRATIC COUNTY
COMMITTEE & WEINGARTEN
235 Mamaroneck Avenue
White Plains, New York 10605
(914) 761-9111

Sanford S. Dranoff, Esq.
Attorney for HOWARD MILLER
One Blue Hill Plaza
P.O. Box 1629
Pearl River, New York 10965-8629
(914) 735-6200

-2-

KAHN, J.

This proceeding seeks to review the nomination of three candidates for election to the office of Justice of the Supreme Court for the Ninth Judicial District of the State of New York. Specific reference is made to the September 18, 1990 Republican Judicial Convention and the September 24, 1990 Democratic Judicial Convention. The actions taken at the aforesaid conventions purport to be in furtherance of a written resolution of the Westchester County Republican and Democratic Committees, which adopted a three-year plan for the cross-endorsement of various judges for County Court, Family Court, Surrogate Court and Supreme Court. In this regard, there is no dispute that the resolution exists or that it even goes so far as to provide that once nominated, each individual will pledge to "provide equal access and consideration, if any, to the recommendations of the leaders of each major political party in conjunction with proposed judicial appointments." Thus, the agreement appears to even extend to the hiring of staff personnel.

Various defendants have moved to dismiss upon considerations of jurisdiction, failure to state cause of action, latches, statute of limitations, etc. Petitioners have also sought a directive from the court that certain respondents are in default for having failed to timely serve pleadings or defectively verified pleadings. However, in the

interests of judicial economy and with an acknowledgment that this decision must be rendered in an exceedingly expeditious manner, the court shall directly address the merits of the petition itself, in order that the inevitable appeal process may be commenced in a timely fashion.

Cross-endorsement of judicial candidates by the major political parties has long been the subject of substantial concern among various segments of the voting public. It has been the focus of study by the Commission on Government Integrity, The Fund for Modern Courts, and even the Chief Judge of the Court of Appeals. However, and most importantly in the context of this judicial proceeding, the practice of cross-endorsement of judicial candidates is not presently prohibited by the Election Law. Further, while the enforceability of the purported resolution would appear to be exceedingly questionable, the reality is that it does not result in the nomination or designation of a candidate for Supreme Court Justice. Only the delegates to a properly convened Judicial District convention can take such action (Election Law, section 6-106).

The Court of Appeals has reiterated that the Legislature of this State has "manifested an intent of general non-interference with the internal affairs of political parties." (Bloom v Nataro, 67 NY2d 1048, 1049). "[J]udicial intervention should only be undertaken as a last resort." (Matter of Bachmann v Coyne, 99 AD2d 742.) Certainly, any

rule of the Westchester County Republican or Democratic Committee which purports to select candidates for the office of Supreme Court Justice must be considered inconsistent with the Election Law, which leaves that selection to the delegates to a judicial convention. However, once having convened a proper convention, and having followed the mandates of the Election Law, any relief premised upon the invalidity of the so-called "Three Year Plan" is precluded. In the case at bar, there is no proof that the judicial conventions at issue were not legally organized, with a quorum present, and that a majority of that quorum duly voted for the candidates named as respondents hereto. As such, the petition does not state grounds upon which relief may be granted (**Matter of Hobson v Lomenzo**, 30 AD2d 981).

The scenario, as presented by the submissions presently before the court, no doubt will continue to fuel the debate concerning the manner in which candidates for judicial office are selected. However, the proper forum must be the Legislature of the State of New York, which has the sole power to amend the process by which judicial candidates are chosen.

The motion of respondent Parisi for a judgment dismissing the proceeding upon the ground that the petition fails to state a cause of action shall be granted. As aforesaid, dismissal of the petition on the merits, renders moot questions of service, timely submission of pleadings and other procedural issues.

DATED: October 16, 1990

     Albany, New York

# EXHIBIT "I"

**Notes from HAVA Coalition Meeting**
February 9, 2006

In today's meeting, State Commissioner Doug Kellner brief the coalition on the status of HAVA in regards to the implementation of the statewide database and the selection of new voting systems.

Voting Machine Systems
There is bi-partisan consensus that the State Board of Elections should "do it once and get it right the first time" regardless of the deadlines relating to HAVA compliance. The Department of Justice, burdened with the enforcement of HAVA provisions and deadlines is "vigorously monitoring" New York and is seriously considering litigation. Conversely, the State Board and AG office are resistant to the idea of agreeing to a consent decree since they fear the imposition of impractical deadlines and timelines. New York State is also working to adhere to the federal 2005 Voluntary Voting Systems Guidelines.

Impediments to implementation of HAVA in NYS:
- Lack of a definitive and explicit plan for implementation
- Insufficient SBOE staff
- Lack of expertise in the composition of regulations and execution of HAVA

Commissioner Kellner also highlighted four main steps that are necessary to implement HAVA. Originally the State plan was to complete the four steps in seriatim (in series), but the DOJ have found this plan to be objectionable and will expect the SBOE to expedite the process.

1. Drafting and approval of voting system regulations
2. Certification
3. Contracting/ Procurement process
4. Acceptance testing and training

Drafting and approval of voting system regulations
There is currently a working draft completed by the SBOE staff that has been circulated to the Commissioners and have incorporated some comments from the public comments period. The draft will be presented formally in the SBOE Commissioners meeting on Tuesday (2/14) and hopefully will be posted for public review on the SBOE website for a minimum of six days prior to its adoption.

Certification
Certification will largely be governed by the SBOE regulations and statues of the State Law. The State Board of Elections have started to ask vendors for potential submissions and so far 4 vendors will submit 7 systems: ES&S (opt-scan with Automark, DRE), Sequoia (Push button and touch screen DRE, opt-scan), Liberty and Advanti (both DRE).

Additionally, the SBOE has retained Cyber (consulting firm) to propose regiments for testing and to advise on the hiring of testing companies. The State Board of Elections staff believes that they have the capacity to only test and certify two voting machine systems at any given time. This process may then inadvertently create an unfair advantage to the voting systems tested first.

Since compliance with HAVA is DOJ's primary objective and under HAVA accessibility issues are of primary concern, and lever machines are currently not compliant to ADA requirements, there are some potential alternatives being considered to achieve compliance:

1. Purchase of Automarks for every polling site in New York State to be tabulated at the central office (count as Emergency ballots) and to be used with lever machines (this may potentially create a disadvantage for NYC which has multiple EDs per polling site)
2. Institute the Vermont telephone-in system where voters must be physically present at the poll site and call in on special Board of Election phones to cast their ballot.

<u>Contracting/ Procurement process</u>

Commissioner Kellner is currently suggesting a 21 day period for public hearings at a county level post certification and prior to procurement decisions. This will hopefully allow the public to provide feedback while also prevent County officials from contracting without public input.

Some considerations for procurement by counties:

- Cost of voting system
- Ease of use by voters
- Ease of operations

<u>Acceptance testing and training</u>

This is an area that have not been fully addressed and remains a serious concern since each machine purchased is suppose to be tested by a board employee. The SBOE currently does not have enough staff to perform the acceptance test since each machine takes about a half day and there is discussion about potentially contracting out this task to the county Boards of Elections. The fear is that these individuals may not have the adequate training or expertise for this task. Additionally, there was no budget requested by the SBOE to pay for acceptance testing. The SBOE is considering transferring the possible excess funds in the implementation of the statewide database to subsidize the acceptance testing or to fund a statewide training program.

Some general recommendations suggested at meeting by Commissioner Kellner:

- Advocates should address specific aspects of the regulations and provide language that maybe incorporated into the machine regs. (since mostly lawyers are working on the current regulations who may not have specific security/accessibility/etc expertise)
- Coalition members should review the federal 2005 Voluntary Voting System Guidelines and note areas that are already incorporated or provisions that New York should be exempt from.
- Advocates should contact the editorial boards of their newspapers to stress the need to implement a quality voting system instead of one that is done haphazardly

Other information of interest in today's meeting:

- It is speculated that New York will most likely return HAVA Section 102 money

<u>Statewide Database</u>

New York State will institute the 'bottom up' approach in creating a statewide database that will be modeled after Washington State (a system developed in consultation with Microsoft). Counties will retain control over their local list and determine eligibility accordingly. Local jurisdictions will also be

responsible for upload into the statewide system (which will be either in real time or within half an hour). The technical issue that remains is the compatibility of the roughly eight different registration systems in use throughout the state since each interface needs to be tailored. The State Board of Elections is considering incurring the cost for statewide compatibility of the database.

The database is not expected to be in use by the November elections, although counties are encouraged to upload local voter databases to the statewide system. The statewide voter registration database is expected to be in place by the spring of 2007.

A minor legal issue that is worth noting is the inconsistent determination of who is registered to vote. No county in New York State has a fixed and completely accurate list due to the provisional ballot rules that allows for challenges on Election Day.

Another issue that was mentioned relating to the statewide databases was the verification and identification requirements. Although Kellner recognized that these are still active issues, he also emphasized the minimal impact of the statewide database system because the identifications are largely done by inspectors on Election Day. Additionally, Affidavit ballots that were cast due to limitations by the identification requirements were not a significant proportion of the total A ballots cast.

# EXHIBIT J



Printed: Monday, November 8, 2004 10:10 AM

| | |
|---|---|
| **From :** | Bill VanAllen <hvanallen@hvc.rr.com> |
| **Reply-To :** | <hvanallen@hvc.rr.com> |
| **Sent :** | Monday, November 8, 2004 5:19 AM |
| **To :** | "Richard Winger (E-mail)" <ban@richardwinger.com> |
| **Subject :** | Money earmarked for modernizing voting system goes unspent AP November 8, 2004, 1:25 AM EST |

Attachment : NS_ci_703_di_d010_pg__al_ (< 0.01 MB)

Money earmarked for modernizing voting system goes unspent

November 8, 2004, 1:25 AM EST

NEW YORK (AP) _ The city has only spent a third of the $27 million available for years that would modernize an outdated voting system. It instead used the money for renovations to Board of Elections offices and a warehouse.

The money was left over from an appropriation ten years ago made to buy voting machines. That project was eventually abandoned, but the funding is still in the city's capital budget. The building renovations are expected to cost $9.4 million, but no other plans have been made to spend the money for needed upgrades for technology and a telephone call center.

During last week's election, the board's Web site and phone lines collapsed with New Yorkers' inquiries on information about where to vote.

John Ravitz, executive director of the elections board told the New York Times in Monday editions that he did not know money from the earlier project was still there and that the Office of Management and Budget did not mention it.

"I've had dozens of meetings with O.M.B. over the last two years," Ravitz said. "And they never said, 'You know what, maybe we should tap into this $27 million left over from 10 years ago.' We clearly would have, had we known about it. It would have made our lives a lot easier."

Ravitz requested $1 million last year during budget negotiations to complete a backup call center on Staten Island. But the request was rejected. About $900,000 would have been spent on the center and $100,000 on more computer space.

*Copyright © 2004, The Associated Press*



EXHIBIT C

# EXHIBIT K



**PRESS RELEASE**

For Immediate Release
July 30, 2003

Contact:
Scott Schell, Brennan Center for Justice, (212) 998-6318
Robin Epstein, Working Families Party, (718) 222-3796

## LAWSUIT CHARGES CITY BOARD OF ELECTIONS KNOWINGLY FAILED TO REPAIR VOTING MACHINES

*60,000 New York City voters thwarted in 2000 election; Similar numbers of lost votes in other recent elections; Minorities disproportionately harmed*

A lawsuit filed today in federal court claims that some 60,000 residents of New York City failed to have their votes counted in the 2000 elections because the City Board of Elections left disabled a voting machine device designed to prevent such "undervoting." The device, known as a "sensor latch," had been disabled in all 7,000 New York City lever voting machines. The suit filed in the Eastern District of New York on behalf of the Working Families Party, ACORN and individual voters by the Brennan Center for Justice at NYU School of Law seeks to compel the Board of Elections to repair the sensor latches in the City's voting machines.

In April 2003, just one month after voting to reactivate the sensor latches, the City Board of Elections reversed its decision, leaving the latches disabled. "No one needs to be reminded that elections can turn on just a handful of votes," said Jeremy Creelan, associate counsel at the Brennan Center. "Sixty thousand votes is a significant number and that is just one election. Hundreds of thousands of New Yorkers have lost their votes and will continue to do so, unless the City Board of Elections repairs the machines."

According to statistics from the boards of elections for the City and State, the "lost vote" rate is much higher in minority communities than in predominantly white areas of New York City; in some cases, communities of color suffer twice the rate of undervoting. In addition, New York City's lost vote rate is significantly higher than the rate for counties upstate and on Long Island.

"The decision of the Board of Elections earlier this year not to repair New York's voting machines is inexcusable," said Creelan. "The Board knew full well the numbers of votes at issue and that the lost

votes are concentrated mainly in low-income communities and communities of color. The Commissioners chose to preserve a discriminatory voting barrier."

**"Sensor Latches": How They Work**

Many New Yorkers using the lever voting machines mistakenly pull the hand lever back to its starting position before voting for any candidate, inadvertently causing a lost vote or "undervote." New York City's voting machines were manufactured with built-in "sensor latches" designed to avoid this problem, preventing voters from leaving the booth until either casting a vote for at least one candidate or affirmatively indicating their intention not to vote for anyone on the ballot. If the sensor latch is in working order, it stops the lever from being pulled back to its original position until at least one candidate has been selected. Beginning in 1964, however, the City Board of Elections disabled the sensor latches on all of the City's lever voting machines.

Plaintiffs in the case charge the City and State Boards of Elections with violations of the Equal Protection Clause, the Voting Rights Act, and the First Amendment, as well as violations of New York State's Constitution.

"New York should have voting machines that function properly and count every vote," said Bob Master of the Working Families Party. "It's easy and cheap to fix the machines, so it's just common sense to go ahead and do it."

"New York City welcomes immigrants to take care of kids in our homes and to wash dishes in our restaurants. We should also welcome them to vote when they become citizens," said Bertha Lewis of ACORN. "Some of our Spanish-speaking members were shocked – and terribly upset – when they had to leave the polls at the last election without knowing whether their votes had counted."

Neal Rosenstein, Election Specialist with New York Public Interest Research Group, said: "Countless thousands of New Yorkers are losing their votes every year because of the inaction of the Board of Elections. It's unfortunate that a lawsuit is needed to stop the Board from disenfranchising those it is intended to serve."

The Brennan Center for Justice at NYU School of Law develops and implements a nonpartisan agenda of scholarship, public education, and legal action that promotes equality and human dignity, while safeguarding fundamental freedoms. For more information, please contact Scott Schell at (212) 998-6318, or Jeremy Creelan at (212) 992-8642.

**OP-ED INDEX**                                                          **BACK TO PRESS CENTER**

BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
161 AVENUE OF THE AMERICAS, 12TH FLOOR
NEW YORK, NY 10013
212 998 6730   FAX 212 995 4550
e-mail: brennan.center@nyu.edu

# EXHIBIT "L"

February 24, 2006

# City's Lawyer Criticizes State on Rules for Voting Machines

By JENNIFER MEDINA

http://www.nytimes.com/2006/02/24/nyregion/24vote.html?_r=1&pagewanted=all&oref=slogin

ALBANY, Feb. 23 - The state's plan to modernize its voting system came under attack again on Thursday, as New York City's chief lawyer called the proposal for regulations on voting machines "gravely defective" and urged the State Board of Elections to overhaul the plan.

The board is scheduled to discuss the proposed regulations on Monday. The rules will govern which voting machines the state certifies for this fall's elections.

In a letter to the four elections commissioners, Michael A. Cardozo, who as corporation counsel heads the city's Law Department, said the latest state proposals ignored major concerns of the city, including recommendations for more security tests and more training procedures.

If the state does not ensure a smooth transition to the new machines, there could be a "waste of millions of state and local dollars and, worst of all, the catastrophic breakdown of an election may ensue," he wrote.

Mayor Michael R. Bloomberg appointed Mr. Cardozo as chairman of a nine-member task force formed to recommend ways to improve the city's election system, which was criticized in the 2004 election.

New York State has long lagged behind the rest of the country in efforts to comply with new requirements under the Help America Vote Act. Last month, the federal Department of Justice threatened a lawsuit if the state did not comply.

But Mr. Cardozo said that railroading the proposed regulations through would only create more problems for the state. "I am horrified that this delay has led to potentially put security, functioning and training for the workers at risk," he said in an interview.

Mr. Cardozo and John Ravitz, the executive director of the City Board of Elections, have both asked to meet with state officials on the matter.

Mr. Ravitz planned to submit a letter on Friday asking the state board to include more extensive security tests and to clarify the procedures the state will use to reach contracts with voting machine manufacturers.

A spokesman for the State Board of Elections, Robert Brehm, said that he could not comment on Mr. Cardozo's letter but that the board would consider the recommendation before it votes on the regulations.

# EXHIBIT M

**Tuesday, February 21, 2006**

**Plan would reduce local election costs**
**Democratic chief cites city, town savings**

**By Michael Valkys**
*Poughkeepsie Journal*
http://www.poughkeepsiejournal.com/apps/pbcs.dll/article?AID=/20060221/NEWS01/602210313/1
006

The number of election districts, inspectors and voting machines in the town and city of Poughkeepsie would decrease under what is being labeled a cost-saving plan by Dutchess County Democratic Elections Commissioner Fran Knapp.

Knapp said the plan would streamline the voting process while saving taxpayer dollars.

"Where we can save money, I think we should try to do it," said Knapp, who sent her proposal to leaders in the town and city last week. "I think this is an improvement all around."

Knapp's plan would cut five election districts and 24 election inspectors in the town. Six districts and 24 inspectors would be eliminated in the city.

"Finding election inspectors can be very difficult," Knapp said. "My proposal not only reduces the number of inspectors needed, but potentially will save hundreds of thousands of dollars with fewer voting machines required."

Knapp's proposal now goes to the town board and city Common Council for ratification. Each body must approve the measure soon if Knapp's plan is going to be used this year.

Quick action stressed

She said any changes must be recorded at the Board of Elections by April 1, so the two governing bodies would have to act on the proposals in the next few weeks.

Common Council Chairman Brian Doyle, D-4th Ward, said he plans to give information on Knapp's plan to council members for discussion.

Doyle said he had some questions, but the proposal seems worth pursuing.

"A lot of it would appear to make good sense," he said.

Supervisor Patricia Myers was out of town and could not be reached Monday.

Knapp said state election law provides for consolidation or alteration of election districts by a city or town. An election district is defined as a geographic area that determines where a person who lives there will vote. Districts can contain up to 950 registered voters, or with Board of Elections approval, up to 1,150 registered voters, she said.

County Republican elections officials said they had not seen Knapp's plan.

Knapp pledged to continue working with local officials, with whom she has already held preliminary discussions.

"I have met with city and town leaders concerning my proposal and will assist them in any way necessary to accomplish our mutual goal of reducing the cost to taxpayers," Knapp said.

"This plan is in the best interests of all taxpayers and voters," she said.

Knapp's plan is separate from proposals being considered by the Common Council that would change boundaries in seven of the city's eight wards.

Those changes are based on population figures from the U.S. Census.

*Michael Valkys can be reached at mvalkys@poughkeepsiejournal.com*

# EXHIBIT N

## CENTER for JUDICIAL ACCOUNTABILITY, INC.

(914) 421-1200 • Fax (914) 684-6554

E-Mail: probono@delphi.com

Box 69, Gedney Station
White Plains, New York 10605

BY FAX and BY HAND
212-868-1229

October 31, 1995

Patricia M. Hynes, Esq.
ABA Standing Committee on Federal Judiciary
c/o Milberg, Weiss, Bershad, Hynes & Lerach
110 Plaza, 49th Floor
New York, New York 10119-0165

Re:  Proposed District Court Nomination of Lawrence E. Kahn

Dear Ms. Hynes:

Transmitted herewith for consideration by the ABA Standing Committee on Federal Judiciary in connection with its evaluation of the qualifications of Justice Lawrence E. Kahn for a federal judgeship are the legal files in Castracan v. Colavita [Folders B-G], an Election Law proceeding over which Justice Kahn presided in October 1990 in the Supreme Court, Albany County.

The Castracan case, which I handled as pro bono counsel to petitioners[1], who were also acting pro bono publico, was no ordinary, run-of-the-mill matter. Rather, it was an extraordinary and historic constitutional challenge to the political manipulation of judicial nominations in New York by the practice of major party cross-endorsements and illegally-conducted judicial nominating conventions. As review of the files demonstrates, what Justice Kahn did in Castracan was to pervert elementary legal standards and falsify the factual record

---

[1]   On June 19, 1991, the day before the last day to file a Notice of Appeal in Castracan to the Court of Appeals, I was served with a retaliatory order of the Appellate Division, Second Department interimly suspending my license to practice law, immediately, indefinitely, and unconditionally. Such order was completely unlawful: it was not based on written charges, was not preceded by a hearing, made no findings, and stated no reasons. In the nearly four and a half years that have since elapsed, I have been denied any hearing as to the basis of my suspension and denied any appellate review. The story of this vicious retaliation to which I was subjected for bringing the Castracan challenge was summarized in an Op-Ed advertisement in the October 26, 1994 New York Times, entitled "Where Do You Go When Judges Break the Law?". A copy is annexed hereto. See, also, Folder A, Doc. 1, pp. 9-10; Folder F, Doc. 1, ¶¶1-3.

**Patricia Hynes, Esq.**         Page Two          October 31, 1995

so as to "dump" the case[2].

Justice Kahn's betrayal of the public trust and of his oath of office was for the purpose of protecting the powerful political leaders implicated in <u>Castracan</u>. It was so identified by me in a December 19, 1991 letter to then Governor Mario Cuomo. A copy of that letter, reciting the specifics of Justice Kahn's politically-motivated decision-making in <u>Castracan</u>, is enclosed [Folder A, Doc. 3]--as are my two previous letters to the Governor on the subject [Folder A, Docs. 1, 2].

I believe my December 19, 1991 letter will be of particular interest to you inasmuch as it refers to the New York State Commission on Government Integrity's report about the corruptive political influences despoiling our judiciary and recommending complete overhaul of the process of judicial election. You may even recall that letter since it, together with my two previous letters to the Governor, were sent under a December 23, 1991 coverletter to the Commission's Chairman, John Feerick, with cc's to all Commissioners--including yourself. For your convenience, a copy of my coverletter is enclosed [Folder A, Doc. 4].

What poetic justice that you, having served as a Commissioner on the New York State Commission on Government Integrity, are now the Second Circuit representative of the ABA's Standing Committee on Federal Judiciary, assigned to review Justice Kahn's proposed nomination to the federal bench since it is Justice Kahn, by his legally and factually insupportable decision in <u>Castracan</u>, who is responsible for perpetuating the corrupted state judicial nominating process decried by the Commission's Report, "Becoming a Judge: Report on the Failings of Judicial Elections in New York State". How appropriate, too, that you should be reviewing the <u>Castracan</u> case--the Commission on Government Integrity having studied the power and influence of its first named Respondent, Anthony Colavita, Chairman of the Westchester Republican County Committee (1979-1995) and former State Republican Party Chairman, as reflected by its report "The Blurred Line: Party Politics and

---

   2     <u>See</u>, in particular:
**Folder B:** Doc. B-1, pp.3-7 (Justice Kahn's Decision);
Doc.  B-1,  pp.8-76  (Petitioners' OSC/Petition/Exhibits:  B-1);
Doc. B-3, pp.1-9; 20-2.
**Folder C:** Doc. C-3, ¶¶7-14; Doc. C-11, ¶¶6, 25, Ex. "A".
**Folder D:** Doc. D-8, pp.1-4, 27-9.
**Folder E:** Doc. E-6 (Oral Argument).
**Folder F:** Doc. F-2, pp.5; Doc. F-11, ¶¶34-5.
**Folder G:** Doc. G-8, pp.4-5; Doc. G-15, ¶¶10-11.

Patricia Hynes, Esq.          Page Three          October 31, 1995

Government in Westchester County"[3].

It is our position that but for Justice Kahn's protection of the political power structure by his misconduct in Castracan, he would not now be rewarded with a proposed nomination to a federal judgeship--any more than he would have been favored, as he was in 1993 with a major party cross-endorsement for re-election to the New York Supreme Court.

On the subject of the 1993 major party cross-endorsement of Justice Kahn and two other state Supreme Court justices in New York's Third Judicial District, I enclose an editorial from the September 26, 1993 Albany Times Union [Folder A, Doc. 6]. Although opining that "cross-endorsement is an integral part of the spoils system", it fails to note Justice Kahn's role in keeping such spoils system intact by his decision in the Castracan challenge.

That the political parties should have rewarded Justice Kahn for his politically-motivated decision-making in Castracan bears out the Commission on Government Integrity's finding that:

> "political parties are geared to reward loyalty, not merit; to discourage, not encourage, independence and diversity; and to obtain power rather than promote justice. Such goals, however valuable to the operation of the party system in general, have no place in the election of our judges". ("Becoming a Judge", p. 293[4])

We believe that the aforesaid political goals should also have no place in the appointment of our federal judges. Yet, the reality is that political considerations also control in federal judicial nominations--a fact we documented three years ago in a six-month investigative study of the federal judicial screening process in relation to the nomination of Westchester County Executive Andrew O'Rourke[5].

---

[3]   The Introduction to that report was quoted in our January 2, 1992 complaint against Judge Kahn, filed with the New York State Commission on Judicial Conduct.   A copy of that complaint is enclosed [Folder A, Doc. 5].

[4]   The page reference is to the report as printed in Government Ethics Reform for the 1990's: The Collected Reports of the New York State Commission on Government Integrity, edited by Bruce Green, Fordham University Press, New York, 1991, 734 pp.

[5]   See, pp. 22-24, 43 of our critique.

Patricia Hynes, Esq.            Page Four            October 31, 1995

As the critique we submitted to the U.S. Senate Judiciary Committee empirically established, Mr. O'Rourke was <u>absolutely</u> unfit for judicial office, his nomination being a political "pay-back" for his having agreed to be the "sacrificial lamb" for the Republican party in running for Governor in 1986 against the then sure-to-win Democratic incumbent, Mario Cuomo.    Our critique highlighted that not only was Mr. O'Rourke rewarded with a judicial nomination by his political patron, Anthony Colavita, but his running-mate for Lieutenant Governor, Michael Kavanaugh, was also rewarded with a federal judicial nomination[6].

Ironically, Justice Kahn has been recommended to fill the <u>very</u> federal judgeship that was to go to Mr. Kavanaugh--at least according to an August 13, 1995 <u>Albany Times Union</u> editorial.    A copy of that editorial, which makes the salutary suggestion that the judicial nomination process--federal and state--not "treat the citizenry as an unnecessary appendage", is enclosed [Folder A, Doc. 7].

I understand from my daughter Elena that until your recent conversation with her, you were unaware of our critique of Mr. O'Rourke's nomination for a federal judgeship.    This is undoubtedly because our May 1992 critique exposed the inadequacy of the investigation of Mr. O'Rourke's credentials by the then Second Circuit representative, William Willis, who, in August 1992, was elevated to the chairmanship of the Standing Committee.

Since Elena tells me that you expressed great interest in seeing our critique, I enclose a copy--which you will note refers to the reports of the New York State Commission on Government integrity. I also enclose a copy of our May 18, 1992 and June 2, 1992 letters to then Senate Majority Leader Mitchell and a Compendium of our correspondence with the ABA [Correspondence Compendium II].

As reflected by that correspondence, the ABA Standing Committee on Federal Judiciary, in addition to failing and refusing to meet its ethical duty to retract its demonstrably insupportable approval rating of Mr. O'Rourke, was totally uninterested in our offer to detail how its screening procedures might be improved.

I would point out--much as Elena did in her January 22, 1993 letter to Mr. Willis [Correspondence Compendium, Exhibit "M"]-- that I have unique credentials in the field of judicial selection.    My biographic profile appears at the end of the critique, together with my 1989 Martindale-Hubbell Law Directory listing.    I would only highlight that I was the first woman to

---

6    <u>See</u>, our critique, footnotes 35 and 61, p. 43.

Patricia Hynes, Esq.          Page Five          October 31, 1995

serve on the New York State Bar Association's Judiciary Committee and served for eight years, interviewing the candidates for New York State Court of Appeals, the Appellate Divisions of the New York Supreme Court, and the New York State Court of Claims.

Finally, I enclose an informational brochure about the Center for Judicial Accountability, Inc, the citizens' action organization I have built from the ruins of the Castracan debacle, together with a copy of Elena's Letter to the Editor, published in the August 14, 1995 New York Law Journal about our Article 78 proceeding against the New York State Commission on Judicial Conduct. Included in the eight complaints of judicial misconduct referred to in her letter as part of the proceeding is my January 2, 1992 complaint against Justice Lawrence Kahn [Folder A, Doc. 5].

As Second Circuit representative to the ABA Standing Committee on Federal Judiciary, you have a direct interest in the proper functioning of the New York State Commission on Judicial Conduct. Plainly, had the Commission undertaken to investigate my complaint against Justice Kahn--which it was required to do under §44.1 of New York's Judiciary Law--and taken appropriate disciplinary action against him for official misconduct, you would not now be burdened by reviewing this unworthy recommendee--who must be resoundingly rejected for his demonstrated lack of integrity.

I would note that investigation by the Commission on Judicial Conduct would have uncovered additional facts bearing adversely upon Justice Kahn's lack of impartiality to adjudicate a case, such as Castracan, challenging a political deal involving contracted-for resignations, pivoting around a Surrogate Court judgeship. This included the fact that, prior to his election in 1979 to the Supreme Court in the Third Judicial District, Justice Kahn had himself resigned--five years early--from his office as Surrogate of Albany County.

I look forward to speaking with you directly about the foregoing. I expect you will have many questions.

Yours for a quality judiciary,

DORIS L. SASSOWER, Director
Center for Judicial Accountability, Inc.

cc:  Chairwoman Carolyn B. Lamm
        ABA Standing Committee on Federal Judiciary
     Irene R. Emsellem, ABA Staff Liaison
     Robert Evans, Director, ABA Governmental Affairs Group

Enclosures: See attached Inventory

Patricia Hynes, Esq.              Page Six              October 31, 1995

## CONTENTS OF TRANSMITTAL

1.   Folders A-G:  Itemization attached

2.   New York Times' Op-Ed advertisement, "Where Do You Go When Judges Break the Law?", 10/26/94

3.   May 1992 critique and compendium of exhibits; 5/18/92 and 6/2/92 ltrs to Senate Majority Leader Mitchell; ABA correspondence compendium

4.   New York Law Journal, Letter to Editor, "Commission Abandons Investigative Mandate", by Elena Sassower, 8/15/95

5.   CJA informational brochure

Re, .nted from the Op-Ed Page, Oct. 26, 19.4, *THE NEW YORK TIMES*

# Where Do You Go When Judges Break the Law?

FROM THE WAY the current electoral races are shaping up, you'd think judicial corruption isn't an issue in New York. Oh, really?

On June 14, 1991, a New York State court suspended an attorney's license to practice law— immediately, indefinitely and unconditionally. The attorney was suspended with no notice of charges, no hearing, no findings of professional misconduct and no reasons. All this violates the law and the court's own explicit rules.

Today, more than three years later, the suspension remains in effect, and the court refuses even to provide a hearing as to the basis of the suspension. No appellate review has been allowed.

Can this really happen here in America? It not only can, it did.

The attorney is Doris L. Sassower, renowned nationally as a pioneer of equal rights and family law reform, with a distinguished 35-year career at the bar. When the court suspended her, Sassower was *pro bono* counsel in a landmark voting rights case. The case challenged a political deal involving the "cross-endorsement" of judicial candidates that was implemented at illegally conducted nominating conventions.

Cross-endorsement is a bartering scheme by which opposing political parties nominate the same candidates for public office, virtually guaranteeing their election. These "no contest" deals frequently involve powerful judgeships and turn voters into a rubber stamp, subverting the democratic process. In New York and other states, judicial cross endorsement is a way of life.

One such deal was actually put into writing in 1989. Democratic and Republican party bosses dealt out seven judgeships over a three-year period. "The Deal" also included a provision that one cross-endorsed candidate would be "elected" to a 14-year judicial term, then resign eight months after taking the bench in order to be "elected" to a different, more patronage-rich judgeship. The result was a musical-chairs succession of new judicial vacancies for other cross-endorsed candidates to fill.

Doris Sassower filed a suit to stop this scam, but paid a heavy price for her role as a judicial whistle-blower. Judges who were themselves the products of cross-endorsement dumped the case.

Other cross-endorsed brethren on the bench then viciously retaliated against her by suspending her law license, putting her out of business overnight.

Our state law provides citizens a remedy to ensure independent review of governmental misconduct. Sassower pursued this remedy by a separate lawsuit against the judges who suspended her license.

That remedy was destroyed by those judges who, once again, disobeyed the law — this time, the law prohibiting a judge from deciding a case to which he is a party and in which he has an interest. Predictably, the judges dismissed the case against themselves.

New York's Attorney General, whose job includes defending state judges sued for wrongdoing, argued to our state's highest court that there should be no appellate review of the judges' self-interested decision in their own favor.

Last month, our state's highest court — on which cross-endorsed judges sit — denied Sassower any right of appeal, turning its back on the most basic legal principle that "no man shall be the judge of his own cause." In the process, that court gave its latest demonstration that judges and high-ranking state officials are above the law.

Three years ago this week, Doris Sassower wrote to Governor Cuomo asking him to appoint a special prosecutor to investigate the documented evidence of lawless conduct by judges and the retaliatory suspension of her license. He refused. Now, all state remedies have been exhausted.

There is still time in the closing days before the election to demand that candidates for Governor and Attorney General address the issue of judicial corruption, which is real and rampant in this state.

Where do you go when judges break the law? You go public.

Contact us with horror stories of your own.



**CENTER** *for*
**JUDICIAL**
**ACCOUNTABILITY**

TEL (914) 421-1200 • FAX (914) 684-6554
E-MAIL probono@delphi.com
Box 69, Gedney Station • White Plains, NY 10605

*The Center for Judicial Accountability, Inc. is a national, non-partisan, not-for-profit citizens' organization raising public consciousness about how judges break the law and get away with it.*

<u>**ITEMIZATION**</u>

**Folder A:**   <u>LETTERS AND EDITORIALS</u>

**(A-1)**    10/24/91 LTR TO GOVENOR MARIO CUOMO

**(A-2)**    10/31/91 LTR TO GOVERNOR MARIO CUOMO

**(A-3)**    12/19/91 LTR TO GOVERNOR MARIO CUOMO

**(A-4)**    12/23/91 LTR TO JOHN FEERICK, CHAIRMAN OF NEW YORK STATE COMMISSION ON GOVERNMENT INTEGRITY, with copies to Commissioners

**(A-5)**    1/2/92 LTR TO NEW YORK STATE COMMISSION ON JUDICIAL CONDUCT

**(A-6)**    "THE PARTIES DO THE VOTING", editorial, <u>ALBANY TIMES UNION</u>, 9/26/93

**(A-7)**    "WHAT A WAY TO PICK JUDGES", editorial, <u>ALBANY TIMES UNION</u>, 8/13/95

## CASTRACAN v. COLAVITA

### Folder B:   SUPREME COURT, COUNTY OF ALBANY, Index # 6056/90

    (B-1)*[1]   APPELLANTS' RECORD ON APPEAL, filed 10/17/90

    (B-2)*   APPELLANTS' APPELLATE BRIEF, filed 10/17/90

    (B-3)*   APPELLANTS' SUPPLEMENTAL RECORD ON APPEAL,
          filed 11/16/90

---

   [1]   Documents on behalf of the Castracan Petitioners-Appellants are indicated by an asterick.

**Folder C:**     **APPELLATE DIVISION, 3rd DEPT., Index # 62134**
                **PREFERENCE APPLICATION**

(C-1)*    10/19/90 DLS LTR FAXED TO APPELLATE DIVISION, 3rd DEPT.

(C-2)    Ltr of Appellate Division, 3rd Dept., dated 10/19/90, faxed to DLS

(C-3)*    APPELLANTS' ORDER TO SHOW CAUSE FOR A PREFERENCE OF APPEAL pursuant to Supreme Court Rules, 3rd Dept., Sec. 800.16

(C-4)    Respondent NYS Board of Elections: Notice of Cross-Motion (Ciampoli)

(C-5)    Respondent Miller: Notice of Cross-Motion (Dranoff)

(C-6)    Respondent Westchester Co. Board of Elections: Opposing Affirmation (Cascio)

(C-7)    Respondent Emanuelli: Opposing Affirmation (Hall, Dickler)

(C-8)    Respondent Nicolai: Opposing Affirmation (Abinanti)

(C-9)    Respondents Westchester Co. Democratic Committee, Mehiel, and Weingarten: Opposing Affirmation (Hashmall)

(C-10)*    10/26/90 state-wide release of The League of Women Voters of New York State: "Cross-Endorsement Case Should Be Heard"

(C-11)*    APPELLANTS' AFFIRMATION IN REPLY AND IN OPPOSITION TO RESPONDENTS' CROSS-MOTIONS (With Exhibits and Supporting Affirmation)

(C-12)    10/30/90 Decision of Appellate Division, 3rd Dept.

(C-13)    10/31/90 Ltr of NYS Board of Elections to Counsel

(C-14)    11/2/90 Ltr of NYS Board of Election enclosing proposed order

(C-15)*    11/2/90 DLS LTR TO APPELLATE DIVISION, 3rd DEPT.

(C-16)    11/13/90 Ltr of Appellate Division, 3rd Dept.

(C-17)    11/14/90 Ltr of Dranoff to Appellate Division

(C-18)    11/23/90 Decision of Appellate Division, 3rd Dept.

**Folder D:**     OPPOSING BRIEFS TO APPELLATE DIVISION / REPLY BRIEF

**(D-1)**     Brief of <u>Respondent NYS Board of Elections</u> (Ciampoli)

**(D-2)**     Ltr of Respondent <u>Westchester Co. Board of Elections</u> (Cascio)

**(D-3)**     Brief of <u>Respondent Emanuelli</u> (Hall, Dickler)

**(D-4)**     Brief of <u>Respondent Miller</u> (Dranoff)

**(D-5)**     Brief of <u>Respondent Nicolai</u> (Abinanti)

**(D-6)**     Brief of <u>Respondents Colavita and Parisi</u> (Parisi)

**(D-7)**     Brief of <u>Respondents Westchester Democratic County Committee, Mehiel, and Weingarten</u> (Hashmall)

**(D-8)***     APPELLANTS' REPLY BRIEF

**(D-9)***     ERRATA SHEET TO APPELLANTS' REPLY BRIEF (1/28/91 coverltr)

**Folder E:**        **AMICUS APPLICATION/ORAL ARGUMENT/DECISION**

**(E-1)\***    2/8/91 Ltr of NAACP Legal and Educational Defense
         Fund

**(E-2)**    2/11/91 ltr of Appellate Division, 3rd Dept.

**(E-3)**    2/21/91 Decision of Appellate Division, 3rd Dept.

**(E-4)\***    3/1/91 Ltr of NAACP Legal and Educational Defense
         Fund

**(E-5)**    Appellate Division, 3rd Dept. "Day Calendar",
         3/25/91

**(E-6)\***    3/25/91 ORAL ARGUMENT OF DLS

**(E-7)\***    Gannett newspaper extracts handed up by
         Appellants, with the Court's permission, at oral
         argument

**(E-8)**    5/2/91 Decision of Appellate Division, 3rd Dept.

**(E-9)**    Order with Notice of Entry, 5/16/91, sent by
         Dranoff, 6/20/91

**Folder F:**     MOTION FOR REARGUMENT, RECUSAL, OR, ALTERNATIVELY, FOR LEAVE TO APPEAL TO COURT OF APPEALS

**(F-1)\***     NOTICE OF MOTION, SUPPORTING AFFIDAVIT, and EXHIBITS (7/25/91)

**(F-2)\***     MEMORANDUM OF LAW (7/25/91)

**(F-3)**     Respondent NYS Board of Elections (Ciampoli):
(a) Notice of Cross-Motion, Affirmation (8/2/91)
(b) Compendium of Exhibits

**(F-4)**     Respondent Emanuelli (Hall, Dickler):
(a) Notice of Cross-Motion, Affidavit (8/12/91)
(b) Memorandum of Law

**(F-5)**     Respondent Miller (Dranoff):
(a) Affirmation (8/8/91)
(b) Memorandum of Law

**(F-6)**     Respondent Nicolai (Abinanti): ltr of 8/15/91

**(F-7)**     Respondent Colavita (Parisi):
Notice of Cross-Motion, Affirmation (8/12/91)

**(F-8)**     Respondent Parisi (Vitagliano):
Notice of Cross-Motion, Affirmation (8/12/91)

**(F-9)\***     APPELLANTS' AFFIRMATION (Vigliano) IN REPLY AND IN OPPOSITION AND EXHIBITS (8/15/91)

**(F-10)**     8/22/91 Ltr from Appellate Division, 3rd Dept.

**(F-11)\***     OMNIBUS AFFIDAVIT (Sassower) IN OPPOSITION TO RESPONDENTS' CROSS-MOTION FOR SANCTIONS AND EXHIBITS (9/6/91)

**(F-12)\***     APPELLANTS' AFFIRMATION (Vigliano) IN REPLY AND IN OPPOSITION TO LATER CROSS-MOTIONS BY RESPONDENTS OTHER THAN NYS BOARD OF ELECTIONS (9/6/91)

**(F-13)\***     APPELLANTS' REPLY MEMORANDUM OF LAW

**(F-14)**     10/17/91 Decision of Appellate Division, 3rd Dept.

**FOLDER G:**      COURT OF APPEALS

(G-1)*      NOTICE OF ENTRY OF ORDER (6/21/91)

(G-2)*      NOTICE OF APPEAL (6/21/91) (Sassower, P.C.)

(G-3)(a)    6/28/91 Ltr of Hashmall

(G-3)(b)*   7/5/91 LTR OF VIGLIANO

(G-3)(c)    7/2/91 Ltr of Dranoff

(G-4)*      CONSENT TO CHANGE ATTORNEY (7/11/91)

(G-5)*      NOTICE OF APPEAL (7/11/91) (Vigliano)

(G-6)*      JURISDICTIONAL STATEMENT

(G-7)       7/16/91 ltr from Court of Appeals

(G-8)*      8/1/91 VIGLIANO LTR TO COURT OF APPEALS WITH ENCLOSURES

           (a)   MEMORANDUM IN SUPPORT OF SUBJECT MATTER JURISDICTION

           (b)   APPENDIX TO CONSTITUTIONAL REFERENCES IN THE RECORD

           (c)   CONTENTS OF DOCUMENT TRANSMITTAL

(G-9)*      New York Law Journal, 8/8/91 "Cases Filed with the Court of Appeals"

(G-10)      Respondent NYS Board of Elections (Ciampoli):
           (a)   Motion to Dismiss and for Sanctions (8/1/91)
           (b)   Supporting Affirmation
           (c)   Compendium of Exhibits
           (d)   8/2/91 coverltr
           (e)   8/6/91 errata sheet

(G-11)      Respondent Miller (Dranoff): Affirmation (8/8/91)

(G-12)      Respondent Nicolai (Abinanti): 8/15/91 ltr

(G-13)      Respondent Emanuelli (Hall, Dickler): 8/20/91 ltr

(G-14)      8/27/91 ltr of NYS Board of Elections

(G-15)*     APPELLANTS' AFFIRMATION (Vigliano) IN OPPOSITION (9/7/91)

(G-16)      10/15/91 Decision of Court of Appeals

(G-17)      10/15/91 Order of Court of Appeals

(G-18)      10/22/91 ltr of NYS Board of Elections

# EXHIBIT "O"



# NEWS
### From the Office of the New York State Comptroller
# Alan G. Hevesi

**CONTACT:**   Press Office
(518) 474-4015

**FOR RELEASE:**   Immediately
September 29, 2004

## Comptroller Issues Report on Local Governments' Fiscal Conditions

Fiscal stress is rising among local governments in New York State, State Comptroller Alan G. Hevesi said today. A number of factors, including higher operating costs, soaring Medicaid expenditures and a weak tax base, are creating financial challenges for local governments, as detailed in the "2004 Annual Report on Local Governments" issued tod by Hevesi. The report is an analysis of data collected from more than 4,000 local governments and special purpose units through fiscal year 2002.

"The combination of rising costs and stagnant revenues from property taxes and other sources is creating daunting fiscal challenges for many local governments, particularly upstate cities," Hevesi said. "Lawmakers must examine eve possible way at both the local and state levels to help local governments respond to today's difficult financial realities.

According to the report, local governments' spending totaled $114 billion in 2002, a 13 percent increase since 1997 over a five-year period after adjusting for inflation. Property taxes, which are the largest source of revenue for local governments, rose statewide about six percent for cities, while counties on average experienced about 11 percent property tax increases in 2003-2004.

In many areas, the property tax base is stagnating and pushing more local governments towards their "tax ceiling" or constitutional tax limit, which is considered to be an indicator of poor financial condition. The State Constitution limits the amount of revenue that can be raised through property taxes for operating purposes. Eight cities, five counties an eight villages have exhausted more than 80 percent of their tax limit in fiscal year 2004, while three of the big five citie were close to their tax limits in 2003-04, including New York City (94.3 percent), Buffalo (88.3 percent) and Rochester (87.5 percent). In 2004, Moody's Investor Service either downgraded or placed a credit watch on 17 of New York's counties and cities — another sign of growing fiscal stress in local governments.

To meet rising fiscal challenges, local governments have increased their reliance on other revenue sources such as sales tax, hotel/motel occupancy tax, mortgage recording tax and vehicle use tax. According to the New York State Association of Counties survey, 46 of 57 counties, not including New York City, now have a sales tax rate that exceec the three percent local limit.

Medicaid expenditures continued to rise for counties accounting for 13 percent of county budgets in 2002. The New York State Department of Health reported that federal, state and local Medicaid expenses, excluding New York City, reached more than $11 billion in 2003, a 12 percent increase over the previous year.

Employee health care costs rose approximately 63 percent for cities and 31 percent for counties from 1997 to 2002. Pension costs also increased in 2004, accounting for approximately four percent of county budgets, six percent of city budgets, and three percent of town and village budgets. Hevesi recently announced that local governments' pension costs will decline by approximately 10 percent in 2006 compared to 2005.

Figures exclude New York City.

*EXHIBIT D*